**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| A.S.R., individually and on behalf of all others similarly situated, | |
| *Petitioner–Plaintiff*, | |
| v. | CIVIL ACTION NO. _____ |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Respondents–Defendants.* | |

## PETITIONER-PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF A TRO

## INTRODUCTION

Petitioner-Plaintiff ("Petitioner") respectfully requests an immediate Temporary Restraining Order ("TRO") to avoid irreparable harm to Petitioner and the proposed class—and to ensure that this Court is not potentially deprived, permanently, of jurisdiction.

In a Proclamation signed on March 14 but not made public until March 15 (after the government had already attempted to use it), the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025) ("Proclamation").[1] The AEA permits the President to invoke the AEA only where the United States is in a "declared war" with a "foreign government or nation" or a 'foreign government or nation' is threatening to, or has engaged in, an "invasion or predatory incursion" against the "territory of the United States." The Proclamation targets Venezuelan noncitizens accused of being part of Tren de Aragua ("TdA"), a criminal gang, and claims that the gang is engaged in an "invasion and predatory incursion" within the meaning of the AEA.

On the evening of March 15, a D.C. District Court issued an order temporarily pausing removals pursuant to the Proclamation for a provisionally certified nationwide class. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025). The D.C. Circuit denied the government's motion to vacate that TRO. On April 7, in a 5-4 decision, the Supreme Court granted the government's application to vacate the TRO order on the basis that Plaintiffs had to proceed through habeas, without reaching the merits of whether the Proclamation exceeds the President's power under the AEA. In doing so, however, the Court emphasized that individuals who are designated under the AEA Proclamation are "entitle[d] to due process" and notice "within

---

[1] https://perma.cc/ZS8M-ZQHJ.

a reasonable time and in such manner as will allow them to actually seek habeas relief" before removal. *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025).

To date, the government has not indicated the type of notice they intend to provide or how much time they will give individuals before seeking to remove them under the AEA. However, in a hearing in the Southern District of Texas on Friday, April 11**, the government said they had not ruled out the possibility that individuals will receive no more than 24 hours' notice; the government did not say whether it was considering providing even less than 24 hours**.

In light of the Supreme Court's ruling, Petitioner and a putative class have filed this habeas action. All five of the original petitioners in the D.C. litigation have likewise filed class habeas petitions in the district where they are detained, along with motions for temporary restraining orders for the putative classes. The first one was filed on April 8, 2025, in the Southern District of New York on behalf of two of the five, and the second on April 9, 2025, in the Southern District of Texas on behalf of the other three. Within hours, both district courts granted *ex parte* requests for TROs, ordering that the named petitioners and putative class members may not be removed from the United States or transferred out of their respective districts. *See G.F.F. v. Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 9, 2025), ECF No. 31, *as amended*, ECF No. 35 (S.D.N.Y. Apr. 11, 2025); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex Apr. 9, 2025), ECF No. 12, *as amended*, ECF No. 34 (S.D. Tex. Apr. 11, 2025). Both courts subsequently held TRO hearings, extended the TROs, and scheduled preliminary injunction hearings, S.D.N.Y on April 22 and S.D. Tex. on April 24.

Petitioner contends that the Proclamation is invalid under the AEA for several reasons. *First*, the Proclamation fails to the AEA's statutory predicates because TdA is not a "foreign nation or government," nor is TdA is engaged in an "invasion" or "predatory incursions" within the meaning of the AEA. Thus, the government's attempt to summarily remove Venezuelan

noncitizens exceeds the wartime authority that Congress delegated in the AEA. *Second,* the Proclamation violates both the Act and due process by failing to provide notice and a meaningful opportunity for individuals to challenge their designation as alien enemies. *Third*, the Proclamation violates the process and protections that Congress has prescribed for the removal of noncitizens in the immigration laws, including protection against being sent to a country where they will be tortured.

**Accordingly, Petitioner moves the Court for a TRO for himself and the putative class barring their summary removal under the AEA and barring Respondents from relocating them outside of this District pending this litigation.[2]** Immediate intervention by this Court is required given that the vacatur of the D.C. district court's TRO no longer protects them and the government's failure to specify how much notice they intend to provide individuals. And if there is an unlawful removal, the government has taken the position that the courts would lose jurisdiction and there would be no way to correct any erroneous removal. Indeed**,** in the government's rush to transfer individuals to El Salvador, the government has mistakenly deported at least one Salvadoran man without legal basis and claims that individual cannot be returned. *See Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025). And declarations and news accounts suggest that many of the alleged Venezuelan TdA members sent to El Salvador pursuant to the Proclamation at issue here were not in fact TdA members. *See* Pls.'

---

[2] Petitioner does not seek to enjoin the President but the President remains a proper respondent because, at a minimum, Petitioner may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

Mot. for Prelim. Inj., *J.G.G.*, No. 25-cv-766-JEB (D.D.C. Mar. 28, 2025), EF No. 67-1 at 3–7 (describing accounts and evidence of individuals without ties to TdA).[3]

The TRO sought here does *not* seek to prohibit the government from prosecuting any individual who has committed a crime. Nor does it seek release from immigration detention or to prohibit the government from removing any individual who may lawfully be removed under the immigration laws.

## LEGAL AND FACTUAL BACKGROUND

### I.    The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war— the War of 1812, World War I, and World War II.

The Act also provides that individuals designated as enemy aliens will generally have time to "settle affairs" before removal and the option to voluntarily "depart."[4] *See, e.g.*, *United States*

---

[3] With this TRO, Petitioner is filing a motion for class certification.
[4] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the U.S.); *id*. § 22 (granting time for departure in accordance with treaty stipulation or "where no such treaty exists, or is in force," a "reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

*ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the [AG] can lawfully remove him against his will.").

## II.    Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA"). The INA, and its subsequent amendments, provide a comprehensive system of procedures that the government must follow before removing a noncitizen from the U.S. *See* 8 U.S.C. § 1229a(a)(3) (INA provides "sole and exclusive procedure" for determining whether noncitizen may be removed).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008) ("It is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe."). First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the U.S. has a right to apply for asylum. Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999) (withholding is mandatory upon meeting statutory criteria). Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18.

### III.    The AEA Proclamation and the Unlawful Removals

On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15. As set forth more fully in Judge Boasberg's opinion, even prior to the Proclamation's publication the government sought to remove individuals. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5; *J.G.G.*, 2025 WL 890401, at *3 (D.D.C. Mar. 24, 2025) (noting that prior to publication of Proclamation, and after a lawsuit was filed against the summary removals, it appeared that "the Government . . . was nonetheless moving forward with its summary-deportation plans.")

In addition to claiming that a *criminal gang* during *peacetime* satisfies the AEA's statutory predicates, the Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. The Proclamation also supplants the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

To date, at least 137 Venezuelan men have been removed under the Proclamation and are now in El Salvador in one of the most notorious prisons in the world, possibly for the rest of their lives. Whether most (or perhaps all) of the class lacks ties to TdA remains to be seen, because Respondents secretly rushed the men out of the country and have provided no information about

them. But evidence since these individuals were sent to El Salvador flights on March 15 increasingly shows that many were not "members" of TdA. *See J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exhs. 4-20) (media reports regarding evidence contradicting gang allegations). Such false accusations are particularly devastating given Petitioner's strong claims for relief under our immigration laws. Exh. A (Gian-Grosso Decl.) ¶ 6.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that the government has used to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). The guide relies on a number of dubious criteria, including physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. But experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *Id.* at 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at 67-4 (Antillano Decl.) ¶ 14; *id.* at 67-12 (Dudley Decl.) ¶ 25.

Experts on El Salvador have also explained how those removed there face grave harm and torture at the Salvadoran Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and use of implements of torture on detainees' fingers. *See J.G.G.*, 2025 WL 1024097, at *9 (U.S. Apr. 7, 2025) (Sotomayor, J., dissenting); *see also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at 44-3 (Goebertus Decl.) ¶¶ 8, 10, 17. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed and detained at CECOT face indefinite detention. *Id.* at 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadoran government

that people held in CECOT "will never leave"); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET) (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").[5]

## IV.    Petitioner

Petitioner A.S.R. is a Venezuelan national who is detained at Moshannon Valley Processing Center in Philipsburg, Pennsylvania. A.S.R. fled Venezuela after he was extorted by groups associated with the Maduro regime. He is currently in immigration removal proceedings and has sought asylum, withholding of removal, and protection under the Convention Against Torture. He is scheduled for a hearing on April 15, 2025 in Elizabeth Immigration Court. A.S.R. was arrested on February 26, 2025 when his neighbor reported that he is a member of Tren de Aragua. A.S.R. vehemently denies these accusations. ICE also asked him about his tattoos. A.S.R. has three tattoos—his mother's name, his grandmother's name, and the word "family." ICE also filed an I-213 alleging Petitioner is affiliated "with the Tren de Aragua criminal organization." A.S.R. is fearful that he will be classified as an alien enemy and summarily deported under the Proclamation.

## LEGAL STANDARD

To obtain a TRO, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see Highmark, Inc. v. UPMC Health Plan, Inc*., 276 F.3d 160, 170–71 (3d Cir. 2001).

---

[5] https://perma.cc/52PT-DWMR.

**ARGUMENT**

I.    **Petitioner is Likely to Succeed on the Merits.**

    A.    **The Proclamation Does Not Satisfy the AEA.**

The Proclamation is unprecedented, exceeding the President's statutory authority in three critical respects: there is no invasion or predatory incursion; no foreign government or nation; and no process to contest whether an individual falls within the Proclamation. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

That skepticism is well warranted here. As Judge Henderson stressed in denying the government's request for a stay of a TRO, a gang's criminal activities do not constitute an "invasion or predatory incursion" under the AEA and the Act is a wartime authority meant to address "military" attacks. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1-13 (D.D.C. Mar. 26, 2025).

        1.    **There Is No "Invasion" or "Predatory Incursion" upon the United States.**

The Proclamation fails, on its face, to satisfy an essential statutory requirement: that there be an "invasion or predatory incursion" directed "against the territory of the United States." The text and history of the AEA make clear that it uses these terms to refer to military actions indicative of an actual or impending war. At the time of enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dict., *Invasion* (1828) ("invasion" is a "hostile entrance into the possession of another; particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); *see also* *J.G.G.*, 2025 WL 914682, at *20 (in the Constitution, "invasion" "is used in a military sense" "*in every instance*"). And "predatory incursion" referred to smaller-scale military raids aimed to

destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's Dict., *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); *J.G.G.*, 2025 WL 914682, at *10 ("predatory incursion" is "a form of hostilities against the United States by another nation-state, a form of attack short of war"). The interpretive canon of *noscitur a sociis* confirms that the AEA's powers extended beyond an existing war only when war was imminent. *Ludecke*, 335 U.S. at 169 n.13 ("the life of [the AEA] is defined by the existence of a war"). Reading "invasion" and "predatory incursion" in light of the neighboring term, "declared war," highlights the express military nature of their usage here. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

The historical context in which the AEA was passed reinforces what Congress meant by "predatory incursion" and "invasion." At the time of passage, French ships were already attacking U.S. merchant ships in U.S. *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by French ships while recognizing that distance from Europe lessened the chance of "invasion"); Act of July 9, 1798, ch. 68, 1 Stat. 578, 578 (authorizing US ships to seize "any armed French vessel" "found within the jurisdictional limits of the United States"). Congress worried that these attacks against the territory of U.S. were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA. *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578

("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").[6]

"Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the U.S. for military purposes. And the Proclamation makes no suggestion that the U.S. will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the U.S. do not suffice because the Proclamation makes clear that that term is referring to "mass illegal migration" and "crimes"—neither of which constitute war within the Founding Era understanding. It asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations." But these actions are not "against the territory" of the U.S. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from any country, could be deemed enemy aliens. *See J.G.G.*, 2025 WL 914682, at *10 (observing that "[m]igration alone [does] not suffice" to establish an "invasion" or "predatory incursion under the AEA).

### 2. The Purported Invasion Is Not by a "Foreign Nation or Government."

The Proclamation also fails to assert that any "foreign nation or government" within the meaning of the Act is invading the United States. Put simply, the Proclamation never finds that

---

[6] At the same time, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the U.S., or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, 1 Stat. 558. As Judge Henderson noted, "[t]his language bears more than a passing resemblance to the language of the AEA, which Congress enacted a mere thirty-nine days later. *J.G.G.*, 2025 WL 914682, at *9. As such, the historical context makes plain that Congress was concerned about *military* incursions by the armed forces of a foreign nation that constitute or imminently precede acts of war.

TdA is a foreign "nation" or "government." Instead, the Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations." But the Proclamation notably does *not* say that TdA operates as a government in those regions. In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the Proclamation's own words, have "members." Proclamation § 1 ("members of TdA"). And it designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects." That glaring mismatch underscores that Respondents are attempting not only to use the AEA in an unprecedented way, but also in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the Proclamation.[7] Even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States. And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. Ryan Goodman, Bluesky (Mar. 26, 2025).[8] The AEA requires the

---

[7] Moreover, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers"); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).

[8] https://bsky.app/profile/rgoodlaw.bsky.social/post/3llc4wzbkr22k (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that.").

President to identify a "foreign nation or government" that is invading or engaging in an invasion or incursion. Because it does not, the Proclamation fails on its face.

Further, the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not criminal gangs like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war[.]"); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Respondents were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

The Proclamation half-heartedly attempts to link TdA to Venezuela by suggesting only that TdA is "supporting," "closely aligned with," or "has infiltrated" the Maduro regime. *See* Proclamation. But those characterizations, even if accepted, are insufficient to establish that a "foreign government or nation" is itself invading the United States. Thus, this court need not go beyond the face of the Proclamation to find that it fails to satisfy the statutory preconditions of the AEA. In any event, experts are in accord that it is "absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined." *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶17; *id.* at 67-4 (Antillano Decl.) ¶ 13; *id.* at 67-12 (Dudley Decl.) ¶¶ 2, 21. As one expert who has done numerous projects for the U.S. government, including on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect."

*Id.* at 67-12 (Dudley Decl.) ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See id.* at 67-21 (Sarabia Roman Decl., Exh. 19) ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

**B.      Summary Removals Without Notice, a Meaningful Opportunity to Challenge "Alien Enemy" Designations, or the Right of Voluntary Departure Violate the AEA and Due Process.**

As the Supreme Court has now made clear, the government must provide Petitioner notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal."). Because the government has not stated whether or how it will comply with the Supreme Court's recent order) a TRO is warranted to ensure that the government provides the Court with protocol for how it will provide notice. *See J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings."). At a minimum, the notice must be translated into a language that individuals can understand, for Venezuelans Spanish and English. Most importantly, there must be sufficient time for individuals to seek review. As during World War II, that notice must be at least 30 days in advance of any attempted removal. And it must be provided to undersigned counsel so that no individual is mistakenly removed. *See*, *e.g.*, *Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101 (U.S. Apr. 10, 2025)

**C.      The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.**

The Proclamation is unlawful for an independent reason: it overrides statutory protections for noncitizens seeking relief from torture by subjecting them to removal without meaningful

consideration of their claims. Congress codified the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* 8 U.S.C. § 1231 note; C.F.R. §§ 208.16-.18. CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. 8 U.S.C. §1231 note. CAT applies regardless of the mechanism for removal. The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's protections. 27 F.4th 718 (D.C. Cir. 2022). Because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, the court held no conflict existed. *Id.* Both statutes could—and therefore must—be given effect. *Id.* at 721, 731-32. This case is on all fours with *Huisha-Huisha,* because the AEA and CAT must be harmonized by applying CAT's protections to AEA removals. Despite this clear statutory framework, the Proclamation overrides all of the INA's protections and deprives those designated under the Proclamation with any opportunity to seek protection against being sent to a place where they will be tortured. *See J.G.G.*, 2025 WL 890401, at *15 ("CAT could stand as an independent obstacle" to "potential torture should Plaintiffs be removed to El Salvador and incarcerated there.")

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal). Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Likewise, the withholding of removal statute explicitly bars returning a noncitizen to a country where their "life or freedom"

16

would be threatened based on a protected ground. *Id.* § 1231(b)(3)(A). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[9] A President invoking the AEA cannot simply sweep away these protections.

### D.    The Proclamation Violates the Procedural Requirements of the INA

Since the last invocation of the AEA more than 80 years ago, Congress has carefully specified the procedures by which noncitizens may be removed. The INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). Indeed, Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[10]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). Indeed, the AEA was invoked just a few years before passage of the 1952 INA. With this awareness, Congress provided that the INA

---

[9] https://perma.cc/X5YF-K6EU.

[10] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use this when she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, opportunity to present evidence, and individualized review by an Article III judge. *Id.* §§ 1532(a), 1534(a)(2), (b), (c)(1)-(2).

contains the "sole and exclusive" procedures for removal and declined to carve out AEA removals from standard immigration procedures, even as it expressly excepted other groups of noncitizens, including those who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks). By ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, the Proclamation unlawfully bypasses the mandated congressional scheme and usurps Congress's Article I power in the process.

## II.    Petitioner and the Class Face Imminent Irreparable Harm.

In the absence of a TRO, Petitioner and the class are at imminent risk of summary removal to places, such as El Salvador, where they face life-threatening conditions, persecution, and torture. *See supra*; *J.G.G.*, 2025 WL 1024097, at *5 ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). That easily constitutes irreparable harm. *See Kahn v. Elwood*, 232 F. Supp.2d 344, 351 (M.D. Pa. 2002) ("possibility of torture" held to "weigh[] heavily in favor of concluding that Petitioner could face irreparable injury"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Patel v. Barr*, No. 20-3856, 2020 WL 4700636, at * 8 (E.D. Pa. Aug. 13, 2020); *see also J.G.G.*, 2025 WL 890401, at *16 ("[T]he risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm" if Venezuelans are removed under the AEA Proclamation to El Salvador). And Petitioner and the class may never get out of these prisons. *See J.G.G.*, 2025 WL 1024097, at *5; *see also supra*.

Even if the government instead removes Petitioner or the class to Venezuela, they face serious harm there, too. Many fled Venezuela for the very purpose of escaping persecution there,

and have pending asylum cases on that basis. For example, A.S.R. has already suffered extortion from groups associated with the Maduro regime and he fears persecution if returned. Exh. A (Gian-Grosso Decl.) ¶ 6. And returning to Venezuela labeled as a gang member by the U.S. government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

Not only do Petitioner and the class face grave harm, thus far the government has tried to execute removals without any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"). Although the Supreme Court has now made clear that meaningful notice is required under the AEA, *J.G.G.*, 2025 WL 102409, at *2, Respondents have yet to concede that they will provide meaningful notice, much less any sense of when that notice will be provided to individuals or what form it will take. As such, there remains an unacceptably high risk that the government will deport class members who are not in fact members of TdA.

III.    **The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.**

The balance of equities and public interest merge in cases against the government. *See Nken v. Holder*, 556 U.S. 418, 436 (2009); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) (citing *Nken*, 556 U.S. at 435). Here, the balance overwhelmingly favors Petitioner. The public has a critical interest in preventing wrongful removals, especially where it could mean a lifetime sentence in a notorious foreign prison. *See Nken*, 556 U.S. at 436. *See also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (in the absence of legitimate, countervailing concerns, "the public interest clearly favors the protection of constitutional

rights."); *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586-587 (M.D. Pa. 2007) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citation omitted); *Boone v. Brown*, No. Civ. 05-750, 2005 WL 2006997, at *15 (D.N.J. Aug. 22, 2005) ("[I]t is always in the public interest to ensure that any prisoner litigation affecting fundamental liberty interests comport with the requirements of due process."). That is especially so given the government's position that it will not obtain the release of individuals mistakenly sent to the notorious Salvadoran prison.

Petitioner and the class, moreover, do not contest Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under the immigration laws. *Cf. J.G.G.*, 2025 WL 914682, at *30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA[.]"). Thus, Respondents cannot show how the government's interests "overcome the irreparable injury to [petitioner] absent a stay, or justify denial of a short stay *pendente lite*." *Ragbir v. United States*, No. 2:17-CV-1256-KM, 2018 WL 1446407, at *18 (D.N.J. Mar. 23, 2018), *appeal dismissed*, No. 18-2142, 2018 WL 6133744 (3d Cir. Nov. 15, 2018); *see also Patel*, 2020 WL 4700636, at *9 (noting "any inconvenience to the Government from the brief delay is far outweighed by the threat of irreparable harm to [plaintiff]" and that "[t]he public interest is also better served by an orderly court process that assures that [the plaintiff's] invocation of federal court relief is considered before the removal process continues.").

## IV.    The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.

In addition to this Court's equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides courts a powerful tool to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean*

*Foods Co.*, 384 U.S. 597, 604 (1966); 28 U.S.C. § 1651(a); *California v. M&P Inv.*, 46 F. App'x 876, 878 (9th Cir. 2002) (finding Act should be broadly construed to "achieve all rational ends of law") (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)); *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at *1 (S.D. Tex. Apr. 9, 2025) ("A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established."). If Petitioner and the class are illegally sent to a foreign country, and El Salvador assumes jurisdiction, the government will argue, as it already has, that this Court will no longer has jurisdiction to remedy the unlawful use of the AEA. *See* Resp. to Order to Show Cause, *J.G.G.*, No. 25-cv-766-JEB (D.D.C. Mar. 25, 2025), ECF No. 58 at 12 (government asserting "once the flights were outside the United States, the President did not need to rely on that Proclamation or Act to justify transferring members of a designated foreign terrorist group to a foreign country"); Resp. to Plfs.' Mot. for Additional Relief, *Abrego Garcia v. Noem*, No. 8:25-cv-951-PX (D. Md. Apr. 13, 2025), ECF No. 65 at 3-4 (government arguing that "[t]he federal courts have no authority to direct the Executive Branch to . . . engage with a foreign sovereign in a given manner," to facilitate return of wrongfully deported individual).

Whereas a traditional TRO requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *See In Re: Nat'l Football League Players Concussion Injury Litigation*, 923 F.3d 96, 109 (3d Cir. 2019) ("[U]nder the All Writs Act, action is authorized to the extent it is 'necessary or appropriate' to enforce a Court's prior orders. . . Or, as this Court has explained it, there is authority under the Act to issue an injunction where such relief is 'necessary, or perhaps merely helpful.'") (citing 28 U.S.C. § 1651 and *Pittsburgh-Des Moines Steel Co. v. United Steelworkers of Am., AFL-CIO*, 633 F.2d 302, 307 (3d Cir. 1980)); *ITT Cmty.*

*Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (court may enjoin "conduct which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"). Courts have explicitly relied upon the AWA in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (staying an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## V.     The Court Should Not Require Petitioner to Provide Security.

Rule 65(c) of the F.R.C.P. invests this Court with discretion as to the amount of security required and whether to waive the requirement altogether. *See Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991), *cert. denied sub nom.*, *Snider v. Temple Univ.*, 502 U.S. 1032 (1992). District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people. *See*, *e.g.*, *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 504 (D.N.J. 2001); *Cradle of Liberty Council, Inc. v. City of Philadelphia*, No. CIV.A. 08-2429, 2010 WL 760250, at *1 (E.D. Pa. Mar. 2, 2010). This Court should do the same here.

## CONCLUSION

The Court should grant a TRO as to the named Petitioner and the class.

Dated: April 15, 2025

Respectfully submitted,

/s/ Vanessa L. Stine
Vanessa L. Stine (PA 319569)
Witold J. Walczak (PA 62976)
Keith Armstrong (PA 334758)*
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA

Lee Gelernt (NY 2502532)*
Daniel Galindo (CA 292854)*
Ashley Gorski (NY 4874228)*
Patrick Toomey (4983979)*
Sidra Mahfooz (NY 5782693)*
Omar Jadwat (NY 4118170)*
Hina Shamsi (NY 2995579)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 519-7871
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: smahfooz@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

P.O. Box 60173
Philadelphia, PA 19102
T: 215-592-1513
F: 267-573-3054
E: vstine@aclupa.org
E: karmstrong@aclupa.org

P.O. Box 23058
Pittsburgh, PA 15222
T: 412-681-7864
F: 267-573-3054
E: vwalczak@aclupa.org

Noelle Smith (CA 344481)*
Oscar Sarabia Roman (CA 341385)*
My Khanh Ngo (CA 317817)*
Cody Wofsy (CA 294179)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
F: (212) 519-7871
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org

Attorneys for Petitioner-Plaintiff
*Pro hac vice applications forthcoming