**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| A.S.R., individually and on behalf of all others similarly situated, *Petitioner–Plaintiff*, v. DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, *Respondents–Defendants.* | Case No. 3:25-cv-00113-SLH |

<u>**REPLY BRIEF IN SUPPORT OF PETITIONER-PLAINTIFF'S MOTION
FOR CLASSWIDE PRELIMINARY INJUNCTION**</u>

# INTRODUCTION

As this Court has already recognized, a district-wide TRO was necessary because Petitioner and proposed class members face serious and irreparable harm if they are removed to a notorious Salvadoran prison while this litigation remains pending.[1] And since Petitioner's opening brief, in related litigation, a district court in the Southern District of Texas has now followed this Court's lead in issuing classwide relief and also held on the merits that the Proclamation does not satisfy the statutory prerequisites for invoking the AEA. The Tenth Circuit also recently denied the government's request to stay a classwide TRO ruling on the merits. Given the likelihood of success on the merits of any one of the multiple claims and the grave harm Petitioner and the class face, a preliminary injunction is plainly warranted.[2]

## ARGUMENT

## I.    THE COURT CAN REVIEW PETITIONER'S CLAIMS.

Petitioner has standing to bring his claims because he faces a "substantial risk" of classification as Proclamation-eligible and removable. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The Proclamation applies on its face to all alleged Venezuelan Tren de Aragua ("TdA") members

---

[1] Respondents raise no arguments in opposition to the Court's class certification order and have therefore waived any such challenge.

[2] Petitioner respectfully requests that the Court further enjoin Respondents from ceding custody (including physical custody) or control of class members to another agency for transfer or removal, given its recent admission that it did exactly that to circumvent another injunction, *see D.V.D. v. U.S. Dept. of Homeland Sec.*, No. 1:25-cv-10676 (D. Mass.), ECF 72 ¶ 3-7 (admitting that government removed individuals to El Salvador, but claiming that government did not violate TRO because "the Department of Defense is not a defendant in this action"), ECF 72-1 (Huettle Dec.) (same); *see also id.* ECF 86 (modifying injunction to cover the DOD). Such relief is warranted not only because of what occurred in the Massachusetts case, but also given news reports that the government used military aircrafts to remove individuals from Colorado on April 24, 25, and 28, then transferred custody to DoD for DoD to "transport the aliens internationally," *see* Marc Sallinger, *Coast Guard Transports ICE Detainees from Colorado to Texas and California for Deportation*, 9News (Apr. 29, 2025), *available at* https://perma.cc/NEM7-ETAR.

without exception. Proclamation ¶¶ 1-3. Petitioner has satisfied the predicate for designation under the Proclamation—Petitioner's I-213 Form alleges association with Tren de Aragua ("TdA"). *See* ECF No. 3-1 ¶ 5. Moreover, although Respondents have not issued a notice to Petitioner, they have declined to foreclose the possibility of designation pending this litigation. *See Driehaus*, 573 U.S. at 165 (finding standing for pre-enforcement review where government "[h]as not disavowed enforcement"); *Doe v. Schorn*, 711 F. Supp. 3d 375 (E.D. Pa. 2024) (finding credible threat when defendant had "not disavowed an intent to prosecute Plaintiff"). Notably, while the government asserts that Petitioner is not subject to the Proclamation, its declarant pointedly avoids making that representation. *See* ECF No. 26-5 (O'Neill Decl.). Nowhere in Deputy Field Office Director's declaration does he address whether the government has evaluated Petitioner's designation under the Proclamation. Nor has the government submitted any updated declaration since April 16, 2025. And it offers no explanation for why Petitioner was transferred to Bluebonnet—a Texas facility where dozens of men were issued notices and nearly removed under the Proclamation. *See id.*[3] This risk is sufficient to establish that Petitioner is "in custody" for habeas purposes. *See Maleng v. Cook*, 490 U.S. 488, 492 (1989); *see also D.B.U.*, 2025 WL 1163530, at *5-6 (rejecting exact same government arguments against habeas jurisdiction and standing).

Given this overwhelming risk, Petitioner need not wait until the actual moment of designation, particularly where government has every incentive to wait until the last minute to designate individuals and, indeed, has done just that in the *A.A.R.P.* class habeas in the Northern

---

[3] This stands in contrast to the government's position in other cases where it submitted declarations stating that the petitioners there were not designated as removable subject to the Proclamation at the time. *See, e.g.*, Valdez Decl., *D.B.U. v. Trump*, No. 25-cv-1163-CNS (D. Co. Apr. 17, 2025), ECF No. 26-1, ¶¶ 13, 22. Even then, courts correctly recognized that petitioners can show imminent risk of designation based on the government's allegations of TdA association or membership, even if they had not yet received a notice. *D.B.U. v. Trump*, No. 1:25-cv-01163-CNS, 2025 WL 1163530, at *6 (D. Colo. Apr. 22, 2025).

District of Texas. *See also J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Mar. 24, 2025), ECF No. 55-1 ¶ 17 (notices distributed on plane). In response to the government's representation to the Court in *A.A.R.P.* that the two named petitioners were not then-designated under the AEA, the district court denied the request for a classwide TRO. *A.A.R.P. v. Trump*, No. 1:25-cv-59-H (N.D. Tx.), ECF No. 27.[4] In doing so, the court stated: "the Supreme Court's opinion in J.G.G., along with the government's general representations about the procedures necessary in these cases, strongly suggest that the putative class is also not facing such an imminent threat." *Id.* at 9. Hours after that order, ICE officers began a widespread plan to ship Venezuelans accused of TdA membership to the CECOT prison in El Salvador under the AEA, in violation of law and with no meaningful due process. *A.A.R.P. v. Trump*, No. 1:25-cv-59-H (N.D. Tx.), ECF No. 30. ICE officers at Bluebonnet began distributing notices under the AEA, and told the men that their removals were imminent and would happen that evening or the next day. *See id.* ECF 30-1 (Brown Dec.). Those removals have now been paused by the Supreme Court. *See A.A.R.P. v. Trump*, No. 24A1007 (U.S. Apr. 19, 2025) (pending).

Since the Supreme Court paused the Bluebonnet removals, the government has reduced the amount of time they are giving designated individuals to state they wish to contest their removal. At one point, the government stated that it would not rule out a notice period as little as 24 hours. Yet now they have reduced the amount of time to a mere 12 hours. ECF No. 40-1 (Cisneros Decl.) ¶ 11. On top of that, the notice form the government provides does not inform the individual of this timeframe. Nor does it even inform the noncitizen that they may contest the designation and removal, much less how they would do so. *Id.* at Ex. A (AEA Notices). It says only that "[i]f you desire to make a phone call, you will be permitted to do so." *Id.* Moreover, the form is also only

---

[4] *A.A.R.P.* has since been re-named as *W.M.M. v. Trump*.

in English, though the overwhelming number of people designated under the AEA speak only Spanish. The government claims that it is supposed to be orally translated but the evidence shows that this is not happening.

Justifiably, courts around the country have enjoined the government to prevent individuals from being whisked away from those Districts without ever having had the opportunity to challenge their removal under the AEA. The courts have done so, even though the government claimed no one had yet been designated under the AEA in those Districts, precisely to avoid what occurred in the Northern District of Texas. *See, e.g., G.F.F. v. Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 11, 2025), ECF No. 35; *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at *2 (S.D. Tex. Apr. 9, 2025); *D.B.U.*, 2025 WL 1106600.

Respondents' argument that Petitioner and class members suffer no injury because they have filed or can file a habeas petition misunderstands the nature of their claims. Opp. 8-9. Petitioner challenges not just the minimum notice required, but also threshold issues like the Proclamation's failure to satisfy the statutory predicates to invoke the AEA—claims that Respondents do not contest and, thus, remain live. The fact that Petitioner has been able to get into court himself does not cure the deficient notice or preclude them from challenging it on behalf of the class. This is especially true given how little notice is given. *See infra*. The government's recent actions in northern Texas underscore the dangerous catch-22 that Respondents' position creates: Those who do manage to file habeas petitions are too early and without injury to challenge the notice process; but those who wait until getting a designation will likely be too late, both because of the deficient notice process and because the government claims it has no ability to rectify their wrongful removal. That Petitioner was able to act swiftly enough to seek relief does not insulate an unlawful policy from judicial review.

Respondents' remaining threshold arguments disclaiming this Court's jurisdiction fare no

better. Opp. 9-13. The Supreme Court has already foreclosed Respondents' argument that the statute's preconditions are not subject to judicial review. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) ("questions of interpretation and constitutionality" of the AEA are reviewable) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). Indeed, *Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased. 335 U.S. at 161, 166-70. The Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that war continues for purposes of the AEA until the political branches declare it over. *Id.* at 170 & n.15. Four years later, the Court reversed a World War II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended [when] Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952). Similarly, in *J.A.V. v. Trump*, Judge Rodriguez likewise found that whether the Proclamation satisfied the AEA's statutory precondition is reviewable. No. 1:25-CV-072, 2025 WL 1257450, at *13-18 (S.D. Tex. May 1, 2025) (granting summary judgment on ground that there is no invasion or predatory incursion within the meaning of the AEA); *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8-10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting government's invasion and predatory incursion arguments).[5]

    The government is also wrong to argue that the "political question" doctrine bars this Court

---

[5] Respondents' reliance on *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024), *California v. United States*, 104 F.3d 1086 (9th Cir. 1997), and *New Jersey v. United States*, 91 F.3d 463 (3d Cir. 1996), is misplaced. *California* and *New Jersey* are at odds with the Supreme Court's guidance about the political-question doctrine. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *see also J.G.G.*, 2025 WL 914682, at *7 (*California* is "inapposite" and "cuts directly against the government"); *New Jersey*, 91 F.3d at 466 (similar action as *California*). *Abbott*'s concurrence bears no relevance—its determination of "invasion" under the Constitution is inapplicable to the distinct statutory predicate required under the AEA—a question governed by statutory limits that are properly subject to judicial review. 110 F.4th at 728.

from reviewing whether the AEA's predicates are satisfied. Opp. 11. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and constitutionality." *Ludecke*, 335 U.S. at 163, 171; *J.G.G.*, 145 S. Ct. at 1006; *see also, e.g.*, *J.G.G.*, 2025 WL 914682, at *5-7 (Henderson, J., concurring) (rejecting government's political-question arguments); *J.A.V.*, 2025 WL 1257450, at *7-11 (same). More generally, the political question doctrine is a "narrow exception" to courts' jurisdiction, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and exists primarily to reinforce the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210 (1962). Applying the doctrine here would undermine Congress's constitutional authority, because it would render the limits that Congress wrote into the statute unenforceable. Indeed, Petitioners are not aware of any time the Supreme Court has ever held that the political question doctrine barred review of statutory terms. *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (Kavanaugh, J., concurring).

The government's remaining arguments are baseless. Interpreting the AEA's terms enacted by Congress is in no way "textually committed" by the Constitution to the executive branch alone. The government is also wrong to argue that no "manageable standards" exist for interpreting the AEA's terms. Opp. 12. It relies on *Martin v. Mott*, but that case addressed a separate statute about the use of militias, and its language about executive power rested on the President's need, as leader of the militia, to maintain discipline in the military. 25 U.S. 19, 30-31 (1827). As the Supreme Court explained in *Japan Whaling Association v. American Cetacean Society*, "interpreting congressional legislation is a recurring and accepted task for the federal courts." 478 U.S. 221, 229-30 (1986) (rejecting application of political question doctrine).

Respondents are also incorrect that the Convention Against Torture ("CAT") claims may be raised only in immigration proceedings and then on appeal directly to the circuit. Opp. 13-14

(citing 8 U.S.C. § 1252(a)(4)). Respondents cite an INA provision that channels review of individual CAT claims to petitions for review. *Id.* But where Petitioner has "no opportunity to raise these issues before an [Immigration Judge] . . . there can be no judicial review as contemplated in the channeling provisions of section 1252(a)(4)." *D.V.D.*, 2025 WL 1142968, at *9. Accordingly, "sections 1252(a)(4) does not bar review '[w]hen a detained [noncitizen] seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal.'" *Id.* (quoting *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 188-90 (3d Cir. 2020)) (finding that § 1252(a)(4) did not bar CAT claim where government initiated third-country removal after conclusion of removal proceedings); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730 (D.C. Cir. 2022) (reviewing claim that the government could not bypass CAT by using the public health laws). And, of course, no petition for review is available here where the government has plucked Petitioner out of immigration proceedings on the theory that the INA and AEA are "distinct," and claimed the government can remove him without a final order of removal under the INA. Opp. 27-28.[6]

## II.    PETITIONER IS LIKELY TO SUCCEED ON THE MERITS.

### A.    The Proclamation Fails to Satisfy the AEA.

The Proclamation does not comport with the terms and construction of the AEA. *First*, the terms invasion and predatory incursion fundamentally demand military and wartime action. *See J.A.V.*, 2025 WL 1257450, at *15-16 (at the time of the AEA's enactment, the ordinary meaning of "invasion" and "predatory incursion" required entry by a military force or an organized armed force); *J.G.G.*, 2025 WL 914682, at *8-10 (Henderson, J., concurring) (similar); *D.B.U.*, 2025 WL

---

[6] Indeed, Petitioner here asks only that this Court determine that the government cannot carry out removals under the AEA without complying with its CAT obligations. Only after a determination that the AEA does not override the INA's humanitarian protections could Petitioner then pursue relief on the merits of his individual CAT claims in the appropriate forum.

1163530, at *9-11 (similar). And the Proclamation makes no finding that satisfies these definitional demands. Respondents' sweepingly broad definitions of "invasion" and "predatory incursion" find no support in the historical meaning of the statute.[7] PI Br. 18 (applying noscitur a sociis); *id.* at 19-20 (discussing historical context in which, in 1798, "invasion" and "predatory incursion" referred to military actions). Respondents' proposed definitions would unlock staggering wartime presidential power in situations well short of the statute's intended scope. *Second*, any purported invasion is not perpetrated by a "foreign nation or government." Respondents cannot demonstrate that TdA is a "nation" within the meaning of the AEA so they instead contend that TdA is intertwined with the Venezuelan government to satisfy the statutory predicate. But the statute requires a "nation." PI Br. 20-21. There would be no need for TdA to undertake hostile actions at the direction of the Maduro regime if TdA was itself a foreign nation or government. *See D.B.U.*, 2025 WL 1163530, at *11 (citing Proclamation). Respondents' argument that TdA's de facto territorial control somehow renders it a "government" is further belied by the fact that the Proclamation names Venezuela, not TdA, as the relevant "foreign government." The Proclamation thus fails to assert a foreign nation or government is invading the United States. PI Br. 20-21.

The Court need look no further than the Proclamation's face: Even accepting the findings, they do not assert that TdA is a foreign nation or government that has citizens or exercises treaty

---

[7] The government cites two cases for the proposition that an "invasion" or "predatory incursion" *includes* military action but is not *limited* to such action. Opp. 19. But both cases use those terms in a military sense. *See N.Y. Cent. R. Co. v. Lockwood*, 84 U.S. 357, 375 (1873) (citing *U.S. Express Co. v. Kountze Bros.*, 75 U.S. 342, 245 (1869)) ("incursion" by "predatory band of armed men" while train passed through Missouri, where Confederate rebellion was ongoing, fell under exception to liability for "dangers incidental to a time of war"); *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805); *see also J.A.V.*, 2025 WL 1257450, at *15-16 (evidence, including *Huidekoper's Lessee*, demonstrates that "the common usage of 'predatory incursion'" required "a military force or an organized, armed force").

powers or other formal governmental powers. Nor, as Judge Rodriguez has recognized in *J.A.V.*, do the findings claim that TdA has engaged in a *military* invasion or incursion against U.S. territory. 2025 WL 1257450, at *18 (finding that Proclamations falls short of describing and "invasion" or "predatory incursion" "as understood at the time of the AEA's enactment."). Rather the Proclamation claims that TdA has engaged in irregular warfare but then describes normal criminal activity, just as its own declarant states. *See* Smith Decl., ECF No. 26-1 (never mentioning military but stating 15 times that TdA engaged in "crimes" or "criminal activity" warranting a "law enforcement" response).

Insofar as the Court wishes to go beyond the face of the Proclamation, the facts set forth in the PI motion declarations by Petitioners' experts only confirm what the Proclamation itself acknowledges: TdA is neither a nation nor a government within the meaning of the statute. In fact, Respondents' declarants are in accord. TdA is not an organized "nation" or "government."[8] Nor is TdA taking concerted action on behalf of the Venezuelan government within the U.S.[9]

B.    **The Notice Process Violates the AEA and the Due Process Clause.**

The Supreme Court made unequivocally clear that AEA designees are entitled to "due process" and "notice and opportunity to be heard," which includes notice "afforded within a reasonable time and in such a manner as will allow them to *actually* seek habeas relief." *J.G.G.*,

---

[8] *Compare* Charles Decl. ¶ 7, ECF No. 26-2 (government states TdA "leadership splintered" in 2023), *with* ECF No. 57-3 (Antillano Decl.) ¶ 11 (since 2023, "the group's coordinating role appears to have weakened"), *and* ECF No. 57-2 (Hanson Decl.) ¶ 16 ("[t]he gang has become increasingly fragmented and decentralized since 2023"), *and* ECF No. 57-4 (Dudley Decl.) ¶ 22 ("since 2023, the group has become more dispersed and holds less sway").

[9] *Compare* Smith Decl. ¶ 9, ECF No. 26-1 (government states TdA is "a loosely affiliated collection of independent calls committing disorganized and opportunistic crimes of violence"), *with* ECF No. 57-3 (Antillano Decl.) ¶ 13 (TdA is "a decentralized and uncoordinated group"), *and* ECF No. 57-2 (Hanson Decl.) ¶ 19 (suspected TdA crimes "do not indicate a systemic criminal enterprise"), *and* ECF No. 57-4 (Dudley Decl.) ¶ 24 ("no evidence of a structured or operational presence in the United States").

145 S. Ct. at 1006 (emphasis added). Under no conceivable understanding of the Supreme Court's ruling would the government's English-only notice—that does not inform designees of their right to contest the designation, much less how to do so or how long they have to do so, or provide them with the factual basis for their designation—comply. *See Francis v. Fiacco*, 942 F.3d 126, 143-44 (2d Cir. 2019) ("merely notifying a prisoner . . . and then placing upon him the burden of navigating the legal system, from his prison cell and without counsel, does not satisfy" due process); *D.B.U.*, 2025 WL 1163530, at *11-12 (AEA notice insufficient). Even more fundamentally the government now states that it will provide just 12 hours to express an intent to file a habeas petition, and 24 hours beyond that to actually file. ECF No. 40-1 (Cisneros Decl.) ¶ 11.[10] *See Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799, 807 n.14 (4th Cir. 1998) (collecting cases holding several days' notice does not satisfy due process); *Pabon v. Mahanoy*, 654 F.3d 385, 400 (3d Cir. 2011) (holding that "inability to read or understand English, combined with denial of access to translation or legal assistance, can constitute extraordinary circumstances that trigger equitable tolling" of the one-year limitations period for filing a federal habeas petition under the AEDPA). The government thus expects scared immigrants with little to no understanding of English or the American legal system, to comprehend that they must specifically state they want to file a habeas petition, and then rapidly file that petition. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950) (the "means employed must be such as one desirous of actually informing" of the individual's rights).

The government's attempt to analogize the use of this wartime authority to the expedited removal procedures in immigration law is misplaced. Opp. 23-25. Expedited removal is a non-

---

[10] Contrary to the government's argument, Opp. 23, the fact that a tiny handful of individuals (all of whom had counsel) have managed to seek judicial review only underscores that the vast majority have not. For example, of the dozens of detainees at Bluebonnet who were given notices, *no one* who was previously unrepresented managed to bring their own case.

adversarial administrative proceeding where immigration officers generally make simple and frequently uncontested determinations—for example, whether the noncitizen seeking admission without valid documents. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7).[11]

Finally, Respondents fare no better in arguing that the government may remove individuals without first providing an opportunity for voluntary departure. Opp. 26-27. To the contrary, § 21 affords *all* "alien enemies" the right to voluntary departure rather than face indefinite detention or forced removal. *See* 50 U.S.C. § 21 (permitting removal of only those alien enemies who "refuse or neglect to depart"); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (opportunity to voluntarily depart is a "statutory condition precedent" to the government's right to remove an alien enemy); *see also J.G.G. v. Trump*, No. 25-766, 2025 WL 890401, at *14 (D.D.C. Mar. 24, 2025). Under § 21, there is no exception to this right to voluntary departure. *See U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (ongoing detention and forced removal unlawful where it "interferes with" alien enemy's "voluntary departure"). Respondents mistakenly invoke § 22's exception for those "chargeable with actual hostility, or other crime against public safety" to suggest that voluntary departure rights under § 21 may be categorically denied. Opp. 27. But the § 22 exception applies to an entirely separate issue: whether designees receive an additional period of time to settle their affairs in accordance with bilateral treaties or

---

[11] Noncitizens who assert a fear of return are entitled to a more substantial procedure including: (1) "information concerning" the asylum screening process and a meaningful opportunity to "consult" with an attorney or other individual in advance, 8 U.S.C. § 1225(b)(1)(B)(iv); (2) a "nonadversarial" interview with a trained asylum officer, 8 C.F.R. § 208.9(b), with a "written record," 8 U.S.C. § 1225(b)(1)(B)(iii)(II), subject to a statutorily mandated "low screening standard," *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020); and (3) review by an immigration judge, 8 C.F.R. § 1208.30(g)(2). Respondents focus on the statutory provision addressing how long the immigration judge should take in concluding that final step, Opp. 24 (quoting 8 U.S.C. § 1225(b)(1)(B)(iii)(III)), but that language about how long the final adjudicator should take says nothing about how much notice noncitizens are entitled. Nothing in this process remotely suggests 12 hours' notice, with no administrative or judicial review, could satisfy due process.

"national hospitality"—it does not apply to the baseline requirement of offering voluntary departure under § 21. In any event, § 22's exception requires a specific, individualized finding— each noncitizen must be "chargeable" with actual hostility or a crime against public safety. *See U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 141 (2d Cir. 1947). Respondents have made no such showing here, let alone afforded any process to contest a determination or one's initial AEA designation.

### C.    The Proclamation Violates the Specific Protections that Congress Established for Seeking Humanitarian Protection, and INA's Procedural Requirements.

Respondents mistakenly argue that there is no direct conflict between CAT and removals under the AEA because the United States avoids removals to countries where noncitizens will likely be tortured. Opp. 29. But that assertion ignores the extensive evidence about Salvadoran prisons. *See* ECF No. 57-5 (Bishop Decl.); ECF No. 57-6 (Goebertus Decl.). It also ignores the central defect in the Proclamation: it categorically forecloses any opportunity even to *invoke* CAT protections to determine whether torture will occur. *See Huisha-Huisha*, 27 F.4th at 731–32.

Respondents also incorrectly contend that the INA's procedural mechanisms are irrelevant. Opp. 27-28. Although Congress knew of the AEA when it enacted the INA, it deliberately declined to exclude AEA-based removals from this statutory scheme—even as it carved out express exceptions elsewhere. *See, e.g.,* 8 U.S.C. §§ 1225(b), 1531.

## III.    THE COURT MAY ENJOIN TRANSFERS OUT OF THE DISTRICT.

Respondents do not contend that the INA's jurisdictional provisions prevent the Court from prohibiting removals outside the country, but argue they prevent the Court from barring transfers to another district. Even assuming the government could transfer people outside of this District, the Court would retain jurisdiction over this case because the class habeas petition and motion for class certification were filed prior to any transfer, as this Court has already recognized. In any

event, Respondents are wrong that the INA's jurisdictional provisions bar this Court from prohibiting transfers within the United States. *See D.B.U.*, 2025 WL 1163530, at *8-9.

Section 1252(a)(2)(B)(ii) applies only to those decisions where Congress has "set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder*, 558 U.S. 233, 247 (2010). But nothing in § 1231(g) authorizes or even mentions "transfer," let alone commits transfer decisions to the agency's unreviewable discretion. *See Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209-10 (4th Cir. 2019) (relying on *Kucana* to hold § 1252(a)(2)(B)(ii) does not bar review of transfer decisions); *Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 20 (1st Cir. 2007) ("section 1231(g) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion"). Likewise, because § 1231(g) does not address transfers, they are not encompassed within the actions that cannot be enjoined under § 1252(f)(1).

Respondents' reliance on § 1252(g) is likewise incorrect because that provision "applies only to three discrete actions . . . to *'commence* proceedings, *adjudicate* cases, or *execute* removal orders.'". *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 482 (1999).[12] The Supreme Court directed the provision be read "narrow[ly]," noting it "implausible that the mention of three discrete events . . . was a shorthand way of referring to all claims arising from deportation." *Id.* And like § 1252(a)(2)(B)(ii), § 1252(g) only applies to an Attorney General's *discretionary* authority. *Id*. at 483. Transfers are plainly not one of the three actions to which § 1252(g) applies. *Id*. at 482. And certainly, Respondents have no discretion to violate the statutory and constitutional provisions which Petitioner raises. *See, e.g.*, *Madu v. U.S. Atty. Gen*., 470 F.3d 1362, 1368 (11th

---

[12] Respondents' reliance on *Glushchenko v. U.S. Dep't of Homeland Sec'y*, 566 F. Supp. 3d 693 (W.D. Tex. 2021), *Liu v. INS*, 293 F.3d 36 (2d Cir. 2002), *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594 (9th Cir. 2002), and *Tazu v. Att'y Gen.*, 975 F.3d 292 (3d Cir. 2020), is misplaced. *Glushchenko* support Petitioner because the court there maintained jurisdiction over statutory and constitutional claims. And *Liu*, *Jimenez-Angles*, and *Tazu*, involved challenges to removal orders or commencement of removal proceedings under the INA, not the AEA.

Cir. 2006) (§ 1252(g) "does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions"); *Garcia v. Att'y Gen.*, 553 F.3d 724, 729 (3d Cir. 2009) (challenge to "very *authority*" behind decision to commence proceedings does "not implicate[]" § 1252(g)). Petitioner does not challenge discretionary actions that the provisions are meant to shield from review. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).[13]

If there were any doubt, the All Writs Act permits a court to "enjoin almost any conduct 'which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'" *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004). As a practical matter, if the government were permitted to transfer Petitioner and class members outside the District to distant detention centers, counsel would face obstacles in gathering evidence and presenting facts relevant to the claims in this case, including whether Petitioner and class members are properly designated as alien enemies under the Proclamation.

## IV.    EQUITABLE FACTORS WEIGH IN PETITIONER'S FAVOR.

Respondents make no credible attempt to demonstrate that a preliminary injunction is unnecessary for Petitioner to avoid "irreparable harm if they are expelled to places where they will be persecuted or tortured." *Huisha-Huisha*, 27 F.4th at 733. Nor can they, given the track record of invoking the AEA to send people to places where they will face life threatening conditions, persecution, and torture in places like CECOT. *See* PI Br. 28-30. Instead, Respondents rely on their argument that Petitioner is not subject to the Proclamation. But, as discussed above, Petitioner faces significant risk of classification and removal under the Proclamation, and it would be at the government's whim, with hardly any notice before he is sent to El Salvador.

---

[13] Respondents rely on *Clifton M. v. Decker*, No. 18-15760, 2019 WL 13298586 (D.N.J. Mar. 19, 2019), Opp. 14-15, but that case involved a discretionary parole decision under the INA, which is not at issue here.

Conversely, the government can make no comparable claim to harm. *See D.B.U. v. Trump*, No. 25-1164, 2025 WL 1233583, at *1 (10th Cir. Apr. 29, 2025) (finding no irreparable harm to government from order restraining AEA removals); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) ("the public interest clearly favors the protection of constitutional rights"). The government retains the ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory immigration laws. *See e.g.*, 8 U.S.C. §§ 1158(b)(2)(A)(ii)-(iii) (bar on asylum if convicted of particularly serious crime or if "serious reasons for believing" they "committed a serious nonpolitical crime" outside the U.S.); 8 U.S.C. § 1231(b)(3)(B)(ii)-(iii) (same for withholding); see also 8 U.S.C. §§ 1226(c), 1231(a)(6).

Respondents' reliance on *Nken v. Holder*, Opp. 31, is misplaced. 556 U.S. 418 (2019). There, the Supreme Court stated that there is a public interest in preventing immigrants from being wrongfully removed, particularly to countries where they face substantial harm. *Id.* at 436. And, critically, *Nken* relied on the government's concession that individuals could return to the United States if they prevailed.[14] *Id.* at 435. But this administration has expressly disavowed that position for individuals removed to El Salvador. PI Br. 5. Without more, Respondents fall back on vague assertions about interference with the "President's statutory and constitutional authority" and conclusory claims of harm to foreign policy negotiations. Opp. 30. These are insufficient to govern the harms Petitioner faces. *See J.G.G.*, 2025 WL 914682, at *11 (Henderson, J., concurring) (government's purported harm is "merely feared as liable to occur at some indefinite time").[15]

## CONCLUSION

The Court should grant a Preliminary Injunction.

---

[14] Respondents' other cases, Opp. 27-28, do not concern irreparable harm.

[15] This Court should exercise its discretion to waive bond (or impose nominal bond of $1). *See* PI Br. 34. Respondent tries to claim a lack of evidence that Petitioner is indigent, Opp. 32, but that is at odds with the simple fact that Petitioner has been incarcerated for months.

Dated: May 2, 2025                                  Respectfully submitted,

 Lee Gelernt (NY 2502532)**                        /s/ Vanessa L. Stine
Daniel Galindo (CA 292854)**                        Vanessa L. Stine (PA 319569)
Ashley Gorski (NY 4874228)**                        Witold J. Walczak (PA 62976)
Patrick Toomey (4983979)**                          Keith Armstrong (PA 334758)**
Sidra Mahfooz (NY 5782693)**                        AMERICAN CIVIL LIBERTIES UNION
Omar Jadwat (NY 4118170)*                           OF PENNSYLVANIA
Hina Shamsi (NY 2995579)**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION                                          P.O. Box 60173
125 Broad Street, 18th Floor                        Philadelphia, PA 19102
New York, NY 10004                                  T: 215-592-1513
T: (212) 549-2660                                   F: 267-573-3054
F: (212) 519-7871                                   E: vstine@aclupa.org
E: lgelernt@aclu.org                                E: karmstrong@aclupa.org
E: dgalindo@aclu.org
E: agorski@aclu.org                                 P.O. Box 23058
E: ptoomey@aclu.org                                 Pittsburgh, PA 15222
E: smahfooz@aclu.org                                T: 412-681-7864
E: ojadwat@aclu.org                                 F: 267-573-3054
E: hshamsi@aclu.org                                 E: vwalczak@aclupa.org


Noelle Smith (CA 344481)**
Oscar Sarabia Roman (CA 341385)*                    Attorneys for Petitioner-Plaintiff
My Khanh Ngo (CA 317817)**                          *Admitted pro hac vice
Cody Wofsy (CA 294179)**                            **Pro hac vice application forthcoming
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
F: (212) 519-7871
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org