# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

A.S.R., *On his own behalf and on behalf*     )
*of others similarly-situated,*     )
    )
    Petitioner,     )
          v.     )     Civil No. 3:25-cv-00113
    )     Judge Stephanie L. Haines
DONALD J. TRUMP, *In his official*     )
*capacity as President of the United States,*     )
*et al.,*     )
    )
    Respondents.     )

## OPINION

Petitioner A.S.R. ("A.S.R."), a Venezuelan man who is currently in immigration custody and represents that he is subject to President Donald J. Trump's ("President Trump") Proclamation invoking "the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" (the "Proclamation"), 90 Fed. Reg. 13034, pursuant to the Alien Enemies Act of 1798, (the "AEA"), 50 U.S.C. § 21, seeks a preliminary injunction from this Court as against Respondents. Specifically, he requests that this Court: (1) find that the Proclamation does not comply with the AEA, (2) deem insufficient the due process that the Executive Branch is currently providing to those detained pursuant to the Proclamation, and (3) afford him certain additional relief.

This case poses significant issues that are deeply interwoven with the constitutional principles upon which this Nation's government is founded. In approaching these issues, the Court begins by stressing the questions that it is *not* resolving at this time.

First, this Court is *not* resolving the question of whether the President of the United States may direct the removal of certain individuals when he acts pursuant to provisions of law other than the AEA, namely the Immigration and Nationality Act (the "INA").

Second, this Court is *not* resolving the question of whether the President of the United States may remove under the AEA individuals who have simply migrated to this country, as opposed to individuals who have entered this country and are members of a Foreign Terrorist Organization. The Court is likewise *not* resolving the question of whether the President may remove under that statute individuals who are members of a gang, as opposed to individuals who have entered this country and are members of a Foreign Terrorist Organization.

And third, this Court is *not* resolving the question of whether individuals who are subject to removal under the AEA are entitled to sufficient "notice ... as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025). The Supreme Court has already found that they are entitled to such notice, and this Court has every intention of requiring reasonable notice, as it explains in more detail below.

Instead, the question that this Court *is* answering is this—so long as the Government provides sufficient notice and due process, may the President issue a Proclamation pursuant to the AEA directing the removal of: (1) Venezuelan citizens, (2) who are fourteen (14) years of age or older, (3) who are within the United States, (4) who are neither actually naturalized nor lawful permanent residents, and (5) who are members of Tren de Aragua ("TdA"), which is a *Foreign Terrorist Organization* ("FTO")? After extensive consideration, and for the following reasons, the Court answers that question in the affirmative.

Therefore, because the Court finds that the President may issue a Proclamation pursuant to the AEA directing the removal of alien members of an FTO (where such members are fourteen (14) years of age or older and neither actually naturalized nor lawful permanent residents) under the AEA, the Court DENIES IN PART Petitioners' Motion for a Preliminary Injunction. (ECF No. 56). However, the Court also finds that the notice that the Executive Branch is currently extending

2

to individuals subject to removal under the AEA is deficient under our Constitution. Accordingly, the Court GRANTS IN PART Petitioners' Motion for a Preliminary Injunction, (ECF No. 56), and the Court will require the detailed notice that the Court outlines below.

## I. Background

### A. The AEA and the President's Proclamation

This case begins with the AEA, which provides that:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

50 U.S.C. § 21.

On March 14, 2025, President Trump signed his Proclamation invoking the AEA. In relevant part, that Proclamation provides as follows:

> On February 20, 2025, the Secretary of State of the United States designated TdA as an FTO pursuant to 8 U.S.C. § 1189. TdA has thousands of members.
>
> TdA is closely aligned with, and has infiltrated, the Maduro regime, including its military and law enforcement apparatus. TdA grew significantly while Tereck El Aissami served as governor of Aragua between 2012 and 2017. In 2017, El Aissami was appointed as vice president of Venezuela. Soon thereafter, the United States Department of the Treasury designated El Aissami as a Specially Designated Narcotics Trafficker under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 et seq. El Aissami is currently a United States fugitive facing charges arising from his violations of United States sanctions triggered by his Department of the Treasury Designation.

Nicolas Maduro ("Maduro") claims to act as Venezuela's President and asserts control over the security forces and other authorities in Venezuela. He further leads the regime-sponsored enterprise Cartel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to "flood" the United States. In 2020, Maduro and other regime members were charged with narcoterrorism and other crimes in connection with this plot against America.

Over the years, Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA. The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States.

TdA operates in conjunction with Cartel de los Soles … and commits brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking. TdA has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States. Many members of TdA have unlawfully infiltrated the United States and are conducting irregular warfare and undertaking hostile actions against this country.

In December 2024, INTERPOL Washington found that TdA has emerged as a significant threat to the United States as it infiltrates migration flows from Venezuela.

90 Fed. Reg. 13034.

As a result of the foregoing, President Trump found that TdA is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." *Id.* Further, he concluded that TdA is taking such actions "against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." *Id.* As a result, President Trump directed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.*

Because the Proclamation references the fact that the Secretary of State deemed TdA an FTO pursuant to Title 8, United States Code, Section 1189, the Court briefly overviews certain portions of that statute.

### B. The Provisions of Title 8, United States Code, Section 1189

Pursuant to Section 1189, the United States Secretary of State:

is authorized to designate an organization as a foreign terrorist organization ... if the Secretary finds that—

**(A)** the organization is a foreign organization;

**(B)** the organization engages in terrorist activity ... or terrorism ... or retains the capability and intent to engage in terrorist activity and terrorism[]; and

**(C)** the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

8 U.S.C. § 1189 (a)(1).

As the Supreme Court has explained, under the statute, "'national security' means the national defense, foreign relations, or economic interests of the United States.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 9 (2010) (quoting 8 U.S.C. § 1189(d)(2)). Further, an entity designated as an FTO may seek review of "that designation before the D.C. Circuit within 30 days of that designation." *Id.* (citing 8 U.S.C. § 1189(c)(1)). The D.C. Circuit shall then hold unlawful and set aside a designation if that Court finds it to be: (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (2) "contrary to constitutional right, power, privilege, or authority;" (3) "in excess of statutory jurisdiction, authority, limitation, or short of statutory right;" (4) "lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court[;]" or (5) not in accord with the procedures required

by law." 8 U.S.C. § 1189(c)(3). Finally, "Congress, by an Act of Congress, may block or revoke such a designation[.]" *Id.* § 1189(a)(5).

On February 20, 2025, Secretary of State Marco Rubio found that TdA, as well as seven other organizations, are subject to designation as FTOs pursuant to Title 8, United States Code, Section 1189. Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 Fed. Reg. 10030-03. As of the date of this Memorandum Opinion, Congress has not blocked or revoked this designation, and the D.C. Circuit has not rendered a decision finding it unlawful.

## C.    Record Evidence in Support of the Proclamation

Respondents in this matter set forth the following two Declarations in support of President Trump's findings in the Proclamation.

The first is the Declaration submitted by Selwyn Smith, who is a "Deputy Assistant Director ('DAD') for Homeland Security Investigations ('HSI') at U.S. Immigrations Customs Enforcement ('ICE') within the U.S. Department of Homeland Security ('DHS')" ("DAD Smith"). (ECF No. 26-1 at 2). In DAD Smith's Declaration, he provides significant background, based on his personal knowledge and experience, regarding TdA's origination, growth, and spread throughout the United States. (*See* ECF No. 26-1). He explains that TdA "members are involved in illicit activity to invoke fear and supremacy in neighborhoods and with the general population[,]" as was evidenced by their takeover of Denver apartment buildings and their alleged commission of "human trafficking, to include trafficking of women from Venezuela; bank fraud; federal narcotics violations; extortion of human smuggling victims; and homicide[.]" (*Id.* at 3–4). Further, TdA members are now "present and committing criminal activity in at least 40 states in

the continental United States and Canada." (*Id.* at 4). Finally, DAD Smith explained that, in January 2024, the New York Police Department ("NYPD") recorded a surge in robberies that the NYPD believes to likely be orchestrated by TdA recruits. (*Id.* at 7). Accused leaders of these TdA groups "have admitted to a complex network connected to Florida and Texas with profits shipped back to South America. Associated crews of this TdA network are allegedly involved in extortion and ransom schemes connected to human smuggling and human trafficking networks." (*Id.*). Indeed, according to DAD Smith, members of "TdA pose an extraordinary threat to the American public." (*Id.* at 3).

The second is a Declaration by Michael G. Kozak, the "Senior Bureau Official within the Bureau of Western Hemisphere Affairs ('WHA') of the United States Department of State" ("Mr. Kozak"). (ECF No. 26-3 at 2). Mr. Kozak made the statements in his Declaration based on his extensive experience engaging in diplomatic work in Venezuela and elsewhere, as well as personal knowledge. (*Id.*). According to Mr. Kozak, U.S. government officials from the White House and Department of State have "negotiated at the highest levels with the Government of El Salvador and with Nicholas Maduro and his representatives in Venezuela in recent weeks for those countries to consent to the removal to Venezuela and El Salvador" of some of the members of TdA. (*Id.*). According to Mr. Kozak, agreements "were recently reached to this effect with these foreign interlocutors to accept the removal of some number of Venezuelan members of TdA. These arrangements were the result of intensive negotiations between the United States and El Savador, and between the United States and the representatives of the Maduro regime." (*Id.* at 3).

### D.      Procedural and Factual History of this Case

Against this backdrop, the Court turns its attention to the procedural and factual history of this case. In doing so, the Court notes that three of the central issues before it are: (1) whether the

Court has jurisdiction over A.S.R.'s Petition, (2) whether the case or controversy requirement is satisfied in this case, and (3) whether the due process that Respondents are currently providing to the individuals subject to the Proclamation is constitutionally sufficient. Accordingly, much of what follows pertains to those issues.

On April 15, 2025, at 10:38 A.M., A.S.R. filed his Habeas Petition. (ECF No. 1). On that same day, he filed his Motion for a Temporary Restraining Order and his Motion for Class Certification and Appointment of Class Counsel. (ECF Nos. 2, 4).

A.S.R. represents that, as of the time he filed his Petition, he was a "Venezuelan man in immigration custody at risk of imminent removal" under the Proclamation. (ECF No. 1 at 2). Along with his Petition, A.S.R. submitted a Declaration from his attorney. (ECF No. 1-2). In that Declaration, A.S.R's counsel made the following statements: (1) as of April 14, 2025, A.S.R. was detained at the Immigration Customs and Enforcement ("ICE") Moshannon Valley Processing Center ("MVPC") in Philipsburg, Pennsylvania, (2) A.S.R. is a citizen of Venezuela who was born in 1995, (3) on February 26, 2025, ICE asked A.S.R. to come in to be put on the Intensive Supervision Appearance Program ("ISAP"), (4) during that appointment, ICE arrested A.S.R. and told him that his neighbor had reported that he is a member of TdA, (5) ICE officers asked him about his tattoos, (6) ICE filed an I-213 accusing A.S.R. of being affiliated with TdA, and (7) while A.S.R. was detained at MVPC, he was in pending immigration removal proceedings, with an immigration hearing scheduled on April 15, 2025, in Elizabeth Immigration Court.[1] (*Id.* at 2). A.S.R. denies that his tattoos are connected to TdA, and he "vehemently denies any connection" to that organization. (*Id.* at 2–3). Finally, according to A.S.R.'s counsel, it appeared that A.S.R.

---

[1] The Court notes that Elizabeth Immigration Court is in Elizabeth, New Jersey. *Elizabeth Immigration Court*, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, https://www.justice.gov/eoir/elizabeth-immigration-court.

was "at grave risk of ICE alleging that he is removable under the [AEA] as a member of [TdA]." (*Id.* at 3).

On April 15, 2025, at 3:12 P.M., this Court entered a temporary restraining order temporarily barring Respondents from "either removing [A.S.R.] ... from the United States, or from transferring [A.S.R.] ... from the Western District of Pennsylvania." (ECF No. 8 at 1). The Court also scheduled a temporary restraining order hearing for April 18, 2025. (*Id.* at 2).

Then, on April 16, 2025, A.S.R. advised the Court that, the previous day, the Government had transferred him to Bluebonnet Detention Center ("Bluebonnet") in Anson, Texas. (ECF No. 25 at 1).

Also on April 16, 2025, the Government submitted a Declaration from Deputy Field Office Director David O'Neill ("Director O'Neill") confirming that A.S.R. had been transferred to Bluebonnet on April 15, 2025. (ECF No. 26-5 at 3). Further, according to Director O'Neill, he was "unaware of any Venezuelan citizens detained at MVPC who [were] confirmed members of [TdA] and have been, are, or will be subject to the [Proclamation.]" (*Id.* at 4). Critically, as the Court discusses below, Director O'Neill's Declaration is dated April 16, 2025, the day after the Government moved A.S.R. to Bluebonnet. (*Id.*).

On April 17, 2025, the Court held a status conference with the parties, during which the Court heard from the parties regarding whether it had jurisdiction over A.S.R.'s Petition. (ECF No. 29). The Court also directed the parties to submit briefs relative to that issue. (*Id.*).

After receiving such briefing from the parties, the Court issued a Memorandum Opinion on April 25, 2025, in which the Court noted that the "parties agree[d] that A.S.R. was present in this District when he filed his Petition at 10:38 A.M. on April 15, 2025, and he was no longer in this District when the Court issued its [temporary restraining order] at 3:12 P.M. that same day."

(ECF No. 44 at 5). Therefore, the Court held that, because "A.S.R. was present in this judicial District when he filed his Petition and named his immediate custodian, this Court has jurisdiction over his Petition, and his subsequent transfer to another district does not deprive this Court of that jurisdiction." (*Id.*).[2]

Also on April 25, 2025, this Court ordered that its temporary restraining order would remain in effect until May 13, 2025, at 3:12 P.M. (*Id.* at 8). That order barred Respondents from removing A.S.R. under the Proclamation and the AEA absent fourteen (14) days' notice and an "opportunity to challenge [his] removal." (*Id.*). The Court directed that this notice be provided "in English and Spanish, the language of those sought to be expelled, and if needed, Spanish-to-English interpreters shall be provided for any necessary hearings." (*Id.*). The Court's order also barred Respondents from transferring A.S.R. out of the Northern District of Texas under the AEA. (*Id.* at 9). Finally, the Court informed A.S.R. that he was permitted to file a motion for a preliminary injunction, and, in the event that he so filed, the Court scheduled a preliminary injunction hearing for May 5, 2025. (*Id.*).

The Court's other April 25, 2025, order that is especially significant at this juncture of this case was its order certifying a class in this matter. (ECF No. 45). The Court notes that it is issuing a separate Opinion and Order of Court today finding that the legal requirements of a class are no longer satisfied in this case. Accordingly, the Court proceeds with its analysis under the conclusion that this is a single-petitioner habeas case—brought by A.S.R. alone.

On April 29, 2025, A.S.R. filed his Motion for a Preliminary Injunction and Brief in Support. (ECF Nos. 56, 57). In his Motion, A.S.R. requests that the Court grant him the following

---

[2] In their April 24, 2025, submission to the Court, Respondents agreed that, because "A.S.R. was physically present in the Western District of Pennsylvania until at least 11:15 a.m. on April 15, 2025, [] jurisdiction and venue attached in the Western District when the Petition was filed." (ECF No. 41 at 4).

relief: (1) a declaration that he is likely to prevail on the merits of his constitutional and statutory challenges to the AEA, (2) an injunction barring Respondents and those associated with them from removing A.S.R. under the AEA, (3) an injunction barring Respondents and those associated with them from transferring A.S.R., (4) an order requiring Respondents to return A.S.R. to this District, (5) an order requiring Respondents to provide at least thirty (30) days' notice prior to any removals under the AEA, and (6) an order requiring Respondents to provide counsel with notice of the designation of alien enemies within the Western District of Pennsylvania. (ECF No. 56 at 4).

On May 1, 2025, Respondents filed their response to A.S.R.'s Motion for a Preliminary Injunction. (ECF No. 59 at 8). In that document, Respondents argued that, *prior to April 16, 2025*, ICE had "reviewed the facts of A.S.R.'s case and concluded that he is not subject to the [Proclamation,]" meaning that he lacks standing to advance his claims in this case. (ECF No. 59 at 7–8). In support of this statement, Respondents cite to Director O'Neill's Declaration. (*Id.* at 8) (citing ECF No. 26-5 ¶¶ 11–18). Finally, and somewhat confusingly, Respondents also indicate that, *as of May 1, 2025*, "ICE has not yet determined that A.S.R. is currently subject to the Proclamation governing removals related to TdA." (*Id.* at 5).

On May 2, 2025, A.S.R. filed his Reply in support of his Motion for a Preliminary Injunction. (ECF No. 66).

Finally, on May 5, 2025, the Court conducted a preliminary injunction hearing. (ECF No. 68). During that hearing, two things occurred that are especially relevant to this Court's analysis of the issues of jurisdiction/standing and the notice that Respondents are providing. With respect to jurisdiction/standing, counsel for Respondents indicated that he could not guarantee this Court, with absolute certainty, that the Government will *not* deem A.S.R. to be subject to removal under the Proclamation in the future. Second, with respect to notice, counsel for Respondents stated that

they are currently providing individuals designated for removal under the AEA at least 12 hours'

notice in order to indicate that they will seek habeas relief. If an individual indicates that he or she

intends to file in habeas, then Respondents will give that individual at least another 24 hours to so

file. Finally, counsel for Respondents stated that, if an individual does file for habeas, the

government has no intent to remove that individual pending his or her litigation.

## II.     Threshold Issues

The Court begins its discussion of the relevant legal issues by resolving the questions of

whether it has jurisdiction over A.S.R.'s Petition and whether the case or controversy requirement

of Article III, Section 2 of the Constitution is satisfied in this matter. The Court then will discuss

the scope of its review of the Proclamation.

### A.     This Court Has Jurisdiction Over A.S.R.'s Petition and the Case or Controversy Requirement is Satisfied

At the preliminary injunction hearing on May 5, 2025, counsel for Respondents informed

the Court that A.S.R. is not currently subject to the AEA and he is not being designated, detained,

or removed pursuant to that authority, but rather he is detained pursuant to the INA. Therefore,

because A.S.R. is not currently in custody under the AEA, counsel for Respondents argue that this

Court lacks jurisdiction over A.S.R.'s Petition. For the same reasons, counsel for Respondents also

contend that A.S.R. lacks standing to challenge the AEA and the Proclamation. For the following

reasons, the Court finds that Respondents are incorrect on both counts.

#### 1.  This Court has Jurisdiction Over A.S.R.'s Petition[3]

As the Supreme Court has explained, the "federal habeas statute gives the United States

district courts jurisdiction to entertain petitions for habeas relief only from persons who are '*in*

---

[3] The Court assumes without deciding that Respondents have not waived their argument regarding jurisdiction by representing to the Court, on April 24, 2025, that this Court had jurisdiction over A.S.R.'s Petition. (ECF No. 41 at 5).

*custody* in violation of the Constitution or laws or treaties of the United States.'" *Maleng v. Cook*, 490 U.S. 488, 490 (1989) (quoting 28 U.S.C. § 2241(c)(3)) (emphasis in original). The Supreme Court has "interpreted [this] statutory language as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed." *Id.* at 490–91. Further, the Supreme Court has "liberally construed the 'in custody' requirement for purposes of federal habeas[.]" *Id.* at 492. Indeed, where a habeas petitioner is serving a federal sentence and has a detainer relative to a pending state sentence, that petitioner may challenge his state sentence, even though he has not yet started to serve it. *Id.* at 493. Finally, courts are to determine the "in-custody" jurisdictional requirement as of the time a petitioner files his or her habeas petition. *Chong v. Dist. Dir. I.N.S.*, 264 F.3d 378, 382–83 (3d Cir. 2001) (finding that it had jurisdiction over a habeas petition where the petitioner was in custody when she filed her petition and ICE subsequently deported her to Malaysia); (*see also* Respondents' Brief, ECF No. 59 at 16) (noting that habeas "requires a petitioner to be 'in custody' under the specific conviction or restraint being challenged *at the time of filing*.") (emphasis added).

In this case, as discussed above, A.S.R.'s counsel made the following statements on April 14, 2025, (1) as of that date, A.S.R. was detained at the ICE MVPC in Philipsburg, Pennsylvania, (2) A.S.R. is a citizen of Venezuela who was born in 1995, (3) on February 26, 2025, ICE asked A.S.R. to come in to be put on the ISAP, (4) during that appointment, ICE arrested A.S.R. and told him that his neighbor had reported that he is a member of TdA, (5) ICE officers asked him about his tattoos, (6) ICE filed an I-213 accusing A.S.R. of being affiliated with TdA, and (7) while A.S.R. was detained at MVPC, he was pending immigration removal proceedings, with an immigration hearing scheduled on April 15, 2025, in Elizabeth Immigration Court in Elizabeth,

New Jersey. *See supra* Section I.D. All of these facts very strongly suggest that as of April 15, 2025, at 10:38 A.M., A.S.R. was "in custody" under the AEA and the Proclamation.

One other point solidifies the Court's conclusion on this score. A.S.R. was scheduled for an immigration hearing in Elizabeth Immigration Court in Elizabeth, New Jersey on April 15, 2025,[4] and at the preliminary injunction hearing, counsel for Respondents represented that A.S.R. is being processed under the INA. Taking those two representations together, the Court is left with the following question: If A.S.R. has always been in custody under the INA rather than the AEA, and since A.S.R. had an immigration hearing scheduled in Elizabeth Immigration Court in New Jersey on April 15, 2025, why then did Respondents move A.S.R. to Texas on April 15, 2025, rather than attending his immigration hearing (thereby apparently delaying his potential removal under the INA)? The Court cannot square that circle. Instead, this Court deems A.S.R.'s abrupt movement to Texas on April 15, 2025, a time at which Respondents were moving several individuals in preparation to remove them under the AEA and the Proclamation, conclusive evidence that A.S.R. was then "in custody" pursuant to the AEA.

Respondents' arguments to the contrary do not change this Court's conclusion. As the Court noted earlier, Respondents assert that, prior to April 16, 2025, ICE "reviewed the facts of A.S.R.'s case and concluded that he is not subject [to the Proclamation.]" (ECF No. 59 at 8). However, the evidence to which Respondents cite in support of that conclusion, the Declaration of Director O'Neill, does not say that ICE had determined that A.S.R. was not removable under the Proclamation. (ECF No. 26-5). Indeed, while Director O'Neill's Declaration does contain a statement that no one at MVPC was subject to the Proclamation as of the day Director O'Neill

---

[4] Respondents have indicated that this hearing was scheduled for May 1, 2025. (ECF No. 26 at 2). Even if that were true, it would not change the Court's analysis. Given the number of individuals currently in ICE detention, it is far from clear to this Court that a May 1, 2025, hearing set for New Jersey can easily be rescheduled for May 1, 2025, in Texas.

offered his Declaration, that Declaration was made on April 16, 2025, *the day after A.S.R. was moved from MVPC.* (*Id.* at 4). Finally, and most to the point, Respondents also have asserted that, *as of May 1, 2025*, "ICE has not yet determined that A.S.R. is currently subject to the Proclamation[.]" (ECF No. 59 at 5). This Court must ask: If ICE determined, before April 16, 2025, that A.S.R. *is not* subject to the Proclamation, why are Respondents now making the statement that ICE has *not yet* made that determination relative to A.S.R.?

In short, while the Court has before it representations indicating that A.S.R. was in custody under the INA as of April 15, 2025, the Court finds that to believe those representations would be to exalt form over fairly significant evidentiary substance.[5] The Court therefore finds that, as of April 15, 2025, at 10:38 A.M., when A.S.R. filed his Habeas Petition, he was "in custody" pursuant to the Proclamation and the AEA. Accordingly, this Court had jurisdiction over A.S.R.'s Petition when he filed it, and the Court finds that, even if Respondents did subsequently shift him to removal proceedings under the INA, that subsequent action does not deprive this Court of jurisdiction, which is measured at the time the Petition is filed. *Chong*, 264 F.3d at 382–83; *see also Maleng*, 490 U.S. at 492 (noting that the Supreme Court "very liberally construes the 'in custody' requirement for purposes of federal habeas").[6]

---

[5] The Court is *not* finding that any particular individual has attempted to deceive the Court. Rather, the Court is speaking to Respondents' contentions as a cohesive group—those contentions are simply not persuasive.

[6] As the Court noted earlier, where a habeas petitioner is serving a federal sentence and has a detainer relative to a pending state sentence, that petitioner may challenge his state sentence, even though he has not yet started to serve it. *Maleng*, 490 U.S. at 493. At the very least, even if A.S.R. *technically* was (or is) subject to removal under the INA rather than the AEA, the Court would still find, in light of all of the facts, representations, and arguments before it, that this Court has jurisdiction over this Petition because A.S.R. *effectively* has a detainer against him indicating that he is subject to removal under the Proclamation. In other words, this Court finds that, at any moment, Respondents could (and indeed may) redesignate (or designate) A.S.R. as removable under the AEA and the Proclamation.

Accordingly, the Court turns its attention to the issue of standing. *Chong*, 264 F.3d at 382–83 (resolving jurisdictional issue and then proceeding to consider whether an Article III, Section 2 case or controversy continued to exist despite petitioner's deportation).

### 2. The Case or Controversy Requirement is Satisfied

With respect to the issue of standing, the Third Circuit recently has offered the following articulation of the law:

> The jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Cont. art. III, § 2. And "[u]nder Article III, a case or controversy can exist only if a plaintiff has standing to sue." *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 286 (3d Cir. 2023) (citation omitted). To establish Article III standing, a plaintiff must "show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 398, 409 (2013) (cleaned up). The plaintiff has to satisfy these requirements, which she must do "for each form of relief that [she] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

*Reading v. N. Hanover Twp., N.J.*, 124 F.4th 189, 196 (3d Cir. 2024) (cleaned up). Further, where a petitioner "seeks prospective relief to address future harm, [he] must show that the 'threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (cleaned up).

Here, in light of the Court's finding above that A.S.R. was "in custody" pursuant to the AEA and the Proclamation when he filed his Petition, *see supra* Section II.A.1, the Court readily finds that he had standing as of that time. Indeed, when he filed his Petition, A.S.R. was personally facing removal from the United States (a concrete, particularized, and actual or imminent injury) under the AEA and the Proclamation (the challenged action) that was redressable by a favorable ruling from this Court (in the form of an injunction, a declaration, the grant of a writ of habeas corpus, or the like). *See Gulden v. Exxon Mobil Corp.*, 119 F.4th 299, 306–07 (3d Cir. 2024).

Further, even if this Court had found that A.S.R. was subject to removal under the INA rather than the AEA when he filed his Petition, the Court would still hold, for the reasons above, *see supra* Section II.A.1, that there was a "substantial risk" that A.S.R. would have been removed under the AEA and the Proclamation as of the time that he filed his Petition. *Reading*, 124 F.4th at 196. Therefore, the Court holds that A.S.R. had standing to bring his Petition as of April 15, 2025, at 10:38 A.M.

But what about the fact that Respondents contend that A.S.R. is not *currently* subject to the AEA and the Proclamation? That issue implicates mootness.

As the Third Circuit has explained, the "loss of Article III standing by itself … does not moot a case; the [respondent] must also demonstrate that no mootness exception applies." *Gulden*, 119 F.4th at 305. Indeed, a "case cannot be moot if a [petitioner] establishes Article III standing, and the [respondent] is unable to demonstrate both the loss of standing and the inapplicability of the exceptions to mootness." *Id.*

Therefore, assuming without deciding that A.S.R. is no longer subject to the AEA and the Proclamation (and likewise no longer at substantial risk of being redesignated as such), the Court inquires whether Respondents have shown that no exception to mootness applies.

The two most likely potential exceptions here are voluntary cessation and capable of repetition yet evading review. *Guldon*, 119 F.4th at 308. With respect to voluntary cessation, that exception "applies when a defendant ceases the allegedly illegal conduct that caused the injury but remains free to return to his old ways." *Id.* (internal quotation marks and citation omitted). The Court finds that that exception is plainly applicable here. Even if Respondents have voluntarily chosen to now make A.S.R. subject to the INA rather than the AEA, there is nothing preventing them from "returning to their old ways" and again subjecting him to the Proclamation. This Court's

discussion with counsel for Respondents during the preliminary injunction hearing confirmed as much. *See supra* Section I.D (noting that "counsel for Respondents indicated that he could not guarantee this Court, with absolute certainty, that the Government will *not* deem A.S.R. to be subject to removal under the Proclamation in the future").

The second exception to mootness, capable-of-repetition-yet-evading-review has two prongs. *Guldon*, 119 F.4th at 309. The first, capable-of-repetition, requires "a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Id.* (cleaned up). The Court holds that that prong is satisfied here. Based on all of the facts before the Court, including the fact that counsel for Respondents declined to state definitively that the Government will not again designate A.S.R. as subject to the Proclamation, the Court finds that there is a demonstrated probability that the same controversy (A.S.R. being subject to the Proclamation) will recur involving the same complaining party (A.S.R.). The second prong, evading-review, requires that the "challenged action [must be] in its duration too short to be fully litigated prior to its cessation or expiration[.]" *Id.* (cleaned up). As the Court noted above, in the absence of a contrary order from this Court, the Government would give A.S.R. twelve hours to indicate that he is seeking habeas relief against his removal under the AEA. *See supra* Section I.D. The Court finds that this action is "in its duration too short to be fully litigated prior to its cessation or expiration." *Guldon*, 119 F.4th at 309. Accordingly, the Court holds that this exception to mootness likewise applies in this case.

In short, for all of the foregoing reasons, the Court finds that it has jurisdiction over A.S.R.'s Petition, and the Court also finds that the case or controversy requirement is satisfied here. The Court therefore turns its attention to the issue of the scope of its review in this matter.

B.    **Scope of Review**

On April 7, 2025, the Supreme Court heard an appeal regarding President Trump's Proclamation directing the "detention and removal of Venezuelan nationals believed to be members of [TdA], an entity that the State Department has designated as [an FTO.]" *J.G.G. v. Trump*, 145 S. Ct. 1003, 1005 (2025). In resolving that appeal, the Supreme Court noted that, on the one hand, "judicial review under the AEA is limited," but on the other hand, an "individual subject to detention and removal under that statute is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id.* at 1006 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172, n.17 (1948)).

Clearly, based on this statement by the Supreme Court, this Court can interpret the meaning of words and terms within the AEA, such as "invasion" and "predatory incursion." *J.A.V. v. Trump*, No. 1-25-CV-072, 2025 WL 1257450, at *9 (S.D. Tex. May 1, 2025). This Court may likewise consider questions such as how much notice is due to an individual subject to the Proclamation. *See J.G.G.*, 145 S. Ct. at 1006 ("More specifically, in this context, AEA detainees must receive notice after the date of this order that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs."). Finally, the Court may theoretically assess the constitutionality of the AEA, although that issue is well-settled in favor of the Act, *Ex parte Zenzo Arakawa*, 79 F. Supp. 468, 470 (E.D. Pa. 1947) (noting that "there can be no question that the [AEA] is constitutional" and collecting cases in support of that principle), and the Court may also assess whether an individual alien is in fact an alien enemy subject to the AEA, a question that A.S.R. does not presently press upon this Court. Thus far, the scope of this Court's review appears clear.

However, A.S.R. invites a more intensive inquiry when he asserts that the Proclamation's findings "cannot survive even the most minimally searching inquiry because they are simply incorrect as a factual matter." (ECF No. 57 at 22).

In declining this invitation, the Court first notes that *J.G.G.* offers no permission for this Court (or any court) to weigh the truthfulness of factual representations within a presidential proclamation pursuant to the AEA. *J.G.G.*, 145 S. Ct. at 1006 (noting that judicial review under the AEA is "limited" and listing, as the proper subjects of judicial review: (1) questions of interpretation, (2) questions of constitutionality, and (3) the question of whether an individual is in fact an alien enemy fourteen years of age or older). Further, in *Ludecke*, the Supreme Court expressed a hesitancy to wade into weighing whether a state of war still existed, a reality that triggered the "declared war" component of the AEA and permitted the president to employ that Act. 335 U.S. at 170 ("These are matters of political judgment for which judges have neither technical competence nor official responsibility.").[7]

In this same vein, the United States District Court for the Southern District of Texas recently concluded that, after a court construes the meaning of statutory terms, such as "invasion" and "predatory incursion," it "is left to the Executive Branch to determine [whether an invasion or predatory incursion has occurred.] As to this decision, the court may not delve into whether the Executive Branch possesses sufficient support for its conclusion, or whether the court agrees with the Executive Branch's determinations." *J.A.V.*, 2025 WL 1257450, at *10. Indeed, that "analysis would require the Executive Branch to disclose to the court the domestic and foreign intelligence that undergirds the finding of an actual or threatened invasion or predatory incursion[,]" which

---

[7] At least to an extent, A.S.R. himself recognizes this when he notes that, in *Ludecke*, the "political judgment" that the Supreme Court "declined to revisit … was simply the decision of Congress and the President not to formally declare the war over." (ECF No. 57 at 10).

would be contrary to law. *Id.* (collecting cases in support); *see also U.S. ex rel. Jaegeler v. Ugo Carusi*, 187 F.2d 912, 913 (3d Cir. 1951) ("From the beginning, the [AEA] has been uniformly recognized as not subject to judicial review.") (judgment vacated on other grounds). Therefore, this Court may not (and therefore will not) assess the truthfulness of the statements in the Proclamation.

Before leaving this subject, the Court also notes that the Southern District of Texas further concluded that a "Presidential declaration invoking the AEA must include sufficient factual statements or refer to other pronouncements that enable a court to determine whether the alleged conduct satisfies the conditions that support the invocation of the statute." *J.A.V.*, 2025 WL 1257450, at *11. That is, while a "President's declaration invoking the AEA need not disclose all of the information that the Executive Branch possesses to support its invocation of the statute, it must identify sufficient information to permit judicial review of whether the foreign nation or government's conduct constitutes" a predatory incursion or the like. *Id.* This articulation of the law appears reasonable and correct to this Court, and as the Court finds below, this particular Proclamation meets this standard. Therefore, the Court need not spend extensive time working out the nuances of its review—the Court assumes without deciding that the Southern District of Texas is correct on this issue and proceeds accordingly.

## III. Discussion

The Court now squarely addresses A.S.R.'s request for a preliminary injunction.

### A. Legal Standard: Preliminary Injunction

As the Third Circuit has explained:

"Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (internal quotation marks omitted). Under the familiar standard of proof, a party "seeking a preliminary injunction must establish that [he]

is likely to succeed on the merits, that [he] is likely to suffer irreparable harm in the absence of preliminary injunctive relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Generally, the moving party must establish the first two factors and only if these gateway factors are established does the district court consider the remaining two factors." *Greater Phil. Chamber of Com. v. City of Phil.*, 949 F.3d 116, 133 (3d Cir. 2020) (internal quotation marks omitted). If the gateway factors are met, "[t]he court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* (internal quotation marks omitted).

*SEC v. Chappell*, 107 F.4th 114, (3d Cir. 2024) (cleaned up).

**B.      Likelihood of Success on the Merits**

In assessing A.S.R.'s likelihood of success on the merits, the Court begins by determining whether the Proclamation satisfies the definition of a "predatory incursion" under the AEA.

**1.    The Proclamation Meets the Definition of a "Predatory Incursion" Under the AEA[8]**

**a.      Relevant Principles of Statutory Construction**

When interpretating a statute, this Court's "job is to interpret the words consistent with their 'ordinary meaning … at the time Congress enacted the statute.'" *Wis. Ctr. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Indeed, this Court's "analysis begins with the plain language of the statute[,]" and where that language is "plain, [a court] must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *see also United States v. Brow*, 62 F.4th 114, 119 (3d Cir. 2023) (noting that a "court considers the language of a statute in its natural and ordinary signification and if there is no ambiguity or obscurity in its language, there will usually be no need to look elsewhere to determine its intent"); *Bonkowski v. Oberg Indus.*, 787 F.3d 190, 199 (3d Cir. 2015) (finding it "significant that the District Court did not mention alternative [dictionary] definitions" of the relevant words

---

[8] Because the Court reaches this finding, it need not and does not reach the issue of what "invasion" means under the AEA.

and concluding that the District Court adopted an "overly narrow" definition of the regulation at issue).

Further, as the Supreme Court has explained, while "every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." *Wis. Ctr. Ltd.*, 585 U.S. at 284 (emphasis in original). For example, when construing the meaning of "money" in a 1937 statute, the Supreme Court held that the term must always mean a "'medium of exchange.' But what *qualifies* as a 'medium of exchange' may depend on the facts of the day." *Id.* (emphasis in original). Accordingly, while "electronic transfers of paychecks" may not have been common in 1937, the Supreme Court had "no doubt they would qualify today as 'money remuneration' under the statute's original public meaning." *Id.*

Similarly, in the context of interpreting constitutional rights, the Supreme Court has held that, while the meaning of a constitutional provision does not change, what qualifies as protected within that provision develops based on the facts of the day. *D.C. v. Heller*, 554 U.S. 570, 582 (2008). Specifically:

> Just as the First Amendment protects modern forms of communications, *e.g., Reno v. American Civil Liberties Union*, 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g., Kyllo v. United States*, 533 U.S. 27, 35–36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the founding.

*Heller*, 554 U.S. at 582.

### b.    The Court Rejects Respondents' Definition of "Predatory Incursion"

For their part, Respondents urge this Court to find that "predatory incursion" under the AEA means "(1) an entry into the United States (2) for purposes contrary to the interests or laws of the United States." (ECF No. 59 at 18). The Court deems that definition deficient.

The Court's basis for this finding is rooted in the dictionary definitions of the words "predatory" and "incursion." One 1773 dictionary defines "predatory" as "[p]lundering; practicing rapine[;]" or "[h]ungry; preying; rapacious; ravenous." *Samuel Johnson's Dictionary* (1773 ed.), https://johnsonsdictionaryonline.com/views/search.php?term=predatory (last accessed May 9, 2025).[9] That same dictionary defines "incursion" as "[a]ttack; mischievous occurrence[;]" or "[i]nvasion without conquest; inroad; ravage." *Id.*

Another dictionary, Webster's 1828 dictionary, defines "predatory" as "[p]lunderng; pillaging; characterized by plundering; practicing rapine; as a *predatory* war; a *predatory* excursion; a *predatory* party[;]" or "[h]ungry; ravenous; as *predatory* spirits or appetite." NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828 ed.) (ebook) (emphasis in original).[10] Further, this same dictionary defines "incursion" as:

> 1. Literally, a running into; hence, an entering into a territory with hostile intention; an inroad; as applied to[11] the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine. Hence it differs from *invasion*, which is the hostile entrance of an army for conquest. During the revolution, the British troops made an *incursion* to Danbury, and destroyed the magazines. In opposing this *incursion*, Gen. Wooster was killed.
>
> 2. Attack; occurrence; as sins of daily *incursion*. [*Unusual.*]

*Id.* (emphasis in original).

---

[9] The Court notes that this online version of Johnson's Dictionary is supported by the National Endowment of the Humanities, among other entities.

[10] The Court notes that citations to ebooks are generally disfavored. However, the Preface to the particular ebook that the Court uses here indicates that its pages contain an "exact digital replica of the original hardcover edition of 1828." NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828 ed.) (ebook). Further, the Court does not have on hand a physical copy of this edition of this dictionary. Therefore, the Court deems it appropriate to cite to this ebook in this instance.

[11] The Court calls to the reader's attention the fact that this part of the definition reads "as applied to[.]" The Court simply notes that this language implies that the definition "hence, an entering into a territory with hostile intention;" *could be* "applied to" something other than a detachment of an army.

The Court pauses here to remark that these definitions contain at least two characteristics that Respondents' definition does not. First, they speak to a cohesive unit entering territory for a united purpose. Respondents' proposed definition is therefore deficient insofar as it could apply to a single individual rather than a collective unit. And second, these definitions indicate that incursion was commonly used to refer to military activity in 1798. Respondents' definition is also therefore deficient because it does not sufficiently account for the *common and significant destructive purpose* for which a *cohesive unit must enter territory* in order to be considered a "predatory incursion."

The Court's initial observations regarding the meaning of "predatory" and "incursion" are confirmed by the uses of those words in and around 1798. Indeed, in 1805, the Supreme Court referred to "hostile incursions" at the hands of Indian tribes within the context of war. *Huidekoper's Lessee v. Douglass*, 4 U.S. 392, 401 (1805). Clearly, this action was taken by a *cohesive unit* that was entering territory with a *common and significant destructive purpose*. Likewise, in 1832, the Supreme Court quoted a charter to William Penn containing the following language: "'because, in so remote a country, near so many barbarous nations, the incursions, as well as of the savages themselves, as of other enemies, pirates, and robbers, may probably be feared ...'" and noting that the instrument then conferred the power of war. *Worcester v. Georgia*, 31 U.S. 515, 545 (1832).[12] Finally, based on its extensive consideration of the use of "predatory incursion" and "incursion" in and around 1798, the United States District for the Southern District of Texas found that "incursion" then "referenced, a military force or an organized, armed force entering a territory to destroy property, plunder, and harm individuals, with a subsequent retreat

---

[12] The Court calls the reader's attention to the fact that "incursions" was used here in reference to both pirates and robbers. In reading this quotation, the Court cannot help but ask: Is a Foreign Terrorist Organization like TdA not the modern equivalent of a pirate or robber? The Court takes that subject up in more detail below.

from that territory." *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450, at *16 (S.D. Tex. May 1, 2025).

Therefore, because the Court finds that Respondents' definition does not sufficiently do justice to the magnitude of what the AEA requires, the Court rejects it. In short, "migration alone" does not constitute a "predatory incursion" under the AEA, and Respondents' proposed definition would lead to certain "migration alone" qualifying as a "predatory incursion" under the statute. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *10–11 (D.C. Cir. Mar. 26, 2025) (Hendrickson, J., concurring) (noting, however, that she was not "pass[ing] on whether TdA has conducted an 'invasion or predatory incursion' 'against the territory of the United States'").

### c. The Court Rejects A.S.R.'s Definition of "Predatory Incursion"

For his part, A.S.R. argues that "predatory incursion" under the AEA is a "military action[] by [a] foreign government[] that constitute[s] or imminently precede[s] acts of war." (ECF No. 57 at 19–20). Therefore, A.S.R. contends that "[m]ass illegal immigration[,]" and "criminal activities" fall short of what the statute requires. (*Id.* at 20). The Court agrees with aspects of A.S.R.'s definition—a "predatory incursion" certainly requires a cohesive unit entering territory with a common and significant destructive purpose, and, as the Court has held, "migration alone" does not suffice. However, A.S.R.'s recounting of the Proclamation suffers from one defect: it omits the fact that, here, the Court is not dealing with "mass illegal immigration" or "criminal activities" alone, but rather an entity that has been designated an FTO in accordance with legal process. *See supra* Section I.B.

That fact has been weighing heavily on the Court in considering the significant questions before it. To reiterate, the United States Secretary of State may only designate as an FTO a foreign organization when that organization "engages in terrorist activity [as defined by law,] or terrorism

[as defined by law], or retains the capability and intent to engage in terrorist activity or terrorism" and when the "terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(B)–(C). Further, a designated FTO may seek extensive judicial review before the District of Columbia Circuit, and Congress may always block or revoke the Secretary of State's designation of an FTO. *See id.* § 1189. In light of the foregoing, coupled with the fact that the Supreme Court has indicated that courts should consider a statute's *meaning* as fixed, but its *application* as subject to change in light of modern developments, *Wis. Ctr. Ltd.*, 585 U.S. at 284, the Court must ask another question: Is a duly-designated FTO that meets the statutory requirements of Title 8, United States Code, Section 1189, and that, according to the Proclamation, enters the United States for purposes such as destabilizing the country, committing rampant crime, and then funneling profits from that crime back to South America, among other things, *see supra* Section I, not the very definition of a cohesive group entering territory with a common and significant destructive purpose, just as a detachment of a military in 1798? Is such an FTO not the modern equivalent of the "enemies, pirates, and robbers," committing "incursions" around the enactment of the AEA? *Worcester*, 31 U.S. at 545. For four interrelated reasons, the Court answers these questions in the affirmative.

First, the AEA does not require an "invasion or predatory incursion" to be "perpetrated, attempted, or threatened against the territory of the United States by *the military of* any foreign nation or government[.]" 50 U.S.C. § 21 (emphasis added). The italicized words are not present in the text, and the word "military" is not in Section 21. Accordingly, if "predatory incursion" necessitates "military" action, that necessity must come from the meaning of "predatory incursion" as of 1798, not the statute itself.

Second, the words "terrorist" and "terrorism" were not in any significant use in 1798. Indeed, neither of the dictionaries that the Court consulted above contains an entry for the word "terrorist" or "terrorism." *See supra* Section III.B.1.b. Further, based on this Court's review of both federal and state caselaw, the first use of "terrorist" that the Court could locate was in 1941, *Hoan v. Journal Co.*, 298 N.W. 228, 230 (Wis. 1941), and the first use of "terrorism" that the Court could locate was in 1880. *Cox v. State*, 1880 WL 9001, *12 (Tex. App. 1880). Since these words were not in any significant use when the AEA was enacted, the Court finds that it is difficult to place too much emphasis on the fact that those living in 1798 did not apply "predatory incursion" to terroristic activities.[13]

Third, modern definitions of "predatory incursion" match the definitions that the Court cited above from 1773 and 1828. Indeed, Merriam-Webster's dictionary currently defines predatory as "1. a: of, relating to, or practicing plunder, pillage, or rapine[;] b: inclined or intended to injure or exploit others for personal gain or growth[;]" as well as "living by predation: predacious[.]" *Predatory*, MERIAM WEBSTER'S, https://www.merriam-webster.com/dictionary/predatory (last accessed May 9, 2025). And Merriam Webster's now defines "incursion" as "a hostile entrance into a territory: RAID" or "an entering in or into (something, such as an activity or undertaking[.]" *Incursion*, MERIAM WEBSTER'S, https://www.merriam-webster.com/dictionary/incursion (last accessed May 9, 2025). Of significant note to the Court, the two examples of "incursion" currently listed on Merriam-

---

[13] On a related note, the Court observes with A.S.R. that Presidents have only previously issued Proclamations pursuant to the AEA during the War of 1812, World War I, and World War II. (ECF No. 57 at 16). However, the statute permits a President to act during "a declared war between the United States and any foreign nation or government, *or* [whenever] any invasion or predatory incursion is perpetrated, attempted, or threatened against the United States by any foreign nation or government[.]" 50 U.S.C. § 21 (emphasis added). The fact that no President has previously needed to (or seen fit to) employ Congress's grant of power in the context of an "invasion" or a "predatory incursion" is not a basis upon which this Court may undo that Congressional grant of power.

Webster's are: "an *incursion* into enemy airspace" and "*there were incursions from the border every summer*[.]" *Id.* (emphasis added).

At this juncture, the Court invites the reader to return to the preceding subsection and reread the definitions of "predatory" and "incursion" from Webster's 1828 dictionary. *See supra* Section III.B.1.b. When the Court performs this exercise, the Court sees that the fundamental meaning of these words has not changed from 1798 (and the surrounding era) until today.[14] Therefore, the only remaining question is whether "predatory incursion" may fairly be applied to FTOs today. As the Court now explains, it finds that "predatory incursion" may be so applied.

Fourth, as the terms "terrorist" and "terrorism" have become more common, courts around the country have used "incursion" in ways that support applying "predatory incursions" to FTOs. For example:

1. In 1873, the United States Supreme Court recounted how, in "*Express Company v. Kountze Brothers*, where the carriers were sued for the loss of gold-dust delivered to them on a bill of lading excluding liability for any loss or damage by fire, act of God, enemies of the government, or dangers incidental to a time of war, they were held liable for a *robbery by a predatory band of armed men* (one of the excepted risks), because they negligently and needlessly took a route which was exposed to such *incursions.*" *N.Y. Cent. R. Co. v. Lockwood*, 84 U.S. 357, 375 (1873) (emphasis added).

2. In 1961, the United States Supreme Court wrote of "[m]eans for effective resistance against *foreign incursion*-whether in the form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, *by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power ...*" *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 95–96 (1961) (emphasis added).

3. In 1992, the First Circuit wrote that the relevant statute, which was enacted in 1976, "was an elaborate and path-breaking legislative enterprise intended to protect the American fishing industry, and to preserve endangered stocks of fish, from what were perceived to be *predatory incursions by foreign fishing fleets into American*

---

[14] Specifically, where Webster's Dictionary of 1828 listed "hence, an entering into a territory with hostile intention; an inroad[,]" *see supra* Section III.B.1.b, as a possible definition of incursion, Webster's dictionary now lists "a hostile entrance into a territory: RAID" as a possible definition of incursion. These two definitions are quite similar.

*waters.*" *Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (emphasis added).

4. In 2013, the following appears in an opinion from the First Circuit: "Fueled by anger over the intervention by the United States in Iraq, the three men agreed in principle to participate in *jihad* against the United States. They discussed possible ways to implement this consensus, including the assassination of political leaders, attacks on military bases, and *incursions at shopping malls.*" *United States v. Mehanna*, 735 F. 3d 32, 56 (1st Cir. 2013) (emphasis added).

5. In 2013, the United States District Court for the Southern District of New York relayed the following travel advisory from the State Department: "'Due to the spread of organized crime, drug and small-arms trafficking, and *incursions by terrorist organizations near Ecuador's border with Columbia ...*" *Chevron Corp. v. Donziger*, No. 11-CV-691, 2013 WL 646399, at *11 (S.D.N.Y. Feb. 21, 2013) (emphasis added).

6. In 2015, the Third Circuit held that, to the "extent that [petitioner's] new evidence referred to the 'growing threat' of the *terrorist organization* known as Boko Haram[,] we agree with the [Board of Immigration Appeals] that this evidence was not material to [petitioner's] case because none of that evidence indicates that *Boko Haram has made incursions in the southwest part of Nigeria* (the region from which [petitioner] hails)." *Atanda v. Atty. Gen. U.S.*, 634 F. App'x 80, 84 (3d Cir. 2015).

7. In 2024, the United States District Court for the Southern District of New York noted that, in "early 2018, *terrorists* attacked the Intercontinental Hotel in Afghanistan. They killed and wounded dozens of individuals, including several Americans, during a blitz that lasted for hours. The Taliban proudly took credit for the heinous attack. But one of the victims and his wife, as well as the family of a deceased victim, blame Iran for the *incursion* too." *Kenny v. Islamic Republic of Iran*, No. 1:22-CV-3299, 2024 WL 4297682, at *1 (D.D.C. Sept. 26, 2024) (emphasis added).

So, then, to recap: (1) the word "military" is not found in the AEA, (2) "terrorist" and "terrorism" were not in significant use at the time that Congress passed the AEA, (3) the words "predatory" and "incursion" both have similar dictionary definitions today as they did in and around 1798, and (4) terrorist organizations are frequently referred to today as committing "incursions" that are certainly "predatory", that is, terrorist organizations are referred to in ways that speak of *cohesive groups* entering territory for *common and a significant destructive purpose(s).*

In sum, based on the Supreme Court's statement that, while the "meaning" of a statute is fixed at its enactment, new "applications" may arise in light of changes of the world, this Court has continued to ask itself this question: If FTOs existed and were entering the United States in 1798 for purposes such as those set out above, *see supra* Section I, would the public and Congress have viewed those FTOs as committing "predatory incursions" against the territory of the United States? For all of the foregoing reasons, the Court answers that question in the affirmative. *See also Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (noting that one reason why the Supreme Court respects the conclusion of the political branch(es) in the realms of national security and foreign policy is that such concerns "arise in connection *with efforts to confront evolving threats* in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess") (emphasis added). Therefore, the Court rejects A.S.R.'s definition of "predatory incursions."

### d.     The Proclamation Describes a "Predatory Incursion" By TdA

In light of all of the foregoing, this Court reaches the following definition of "predatory incursion" under the AEA: "a hostile entry into the United States by a cohesive group of individuals, such as a military detachment or a designated Foreign Terrorist Organization, who are united by a common goal of causing significant disruption to the public safety—whether that be the safety of persons, property, or pecuniary interests—of those within the United States." The Court finds that that definition is faithful to the *meaning* of "predatory incursions" in 1798, but it also accounts for new *applications* given "changes in the world." *Wis. Ctr. Ltd.*, 585 U.S. at 284.

When this Court applies that definition to the Proclamation and its finding that TdA is committing a "predatory incursion," the Court holds that the Proclamation complies with the AEA.

First, as the Court alluded to above, *see supra* Section II.B, the Proclamation and the Declarations that Respondents have submitted to this Court indicate that there is a factual basis for President Trump's conclusions in the Proclamation. Most of all, the Proclamation references the fact that the Secretary of State has designated TdA as an FTO pursuant to Title 8, United States Code, Section 1189, a designation that heavily supports the conclusions within the Proclamation that TdA is a cohesive group united by a common goal of causing significant disruption to the public safety of the United States. *See supra* Section I.B. Further, the Declarations that Respondents have submitted support President Trump's findings regarding the type and scope of harm that TdA threatens relative to this country. *See supra* Section I.C.

Second, the Court finds that the Proclamation and the documents it references (namely the Secretary of State's designation of the TdA as an FTO) support the finding that TdA is committing a "predatory incursion" as that term is defined in the AEA. Indeed, an FTO is a cohesive group of individuals united by a common goal of causing significant disruption to the common safety of the public, *see supra* Section I.B, just like military detachments or pirates around the time that Congress enacted the AEA. And an entity that is: (1) a designated FTO, (2) bent on destabilizing the United States, and (3) flooding the United States with illegal narcotics, which it is using as a "weapon" against the citizens of the United States, is certainly united by the common goal of causing significant disruption to the public safety—whether that be the safety of persons, property, or pecuniary interests—of those within the United States. 90 Fed. Reg. 13033.

Therefore, for all of the foregoing reasons, the Court finds that the Proclamation meets the definition of "predatory incursion" under the AEA, and the Court finds that A.S.R. has not shown a likelihood of success on the merits on this issue.

### 2. The Proclamation Meets the Definitions of "Against the Territory of the United States" and "By Any Foreign Nation or Government"

The Court now turns to the statutory phrases "against the territory of the United States" and "by any foreign nation or government[.]" 50 U.S.C. § 21.

With respect to the phrase "against the territory of the United States[,]" A.S.R. contends that, at the time of the "founding, actions 'against the territory of the United States' were expressly understood to be military in nature." (ECF No. 57 at 19). But the Court has already explained why it finds that the generation that passed the AEA would deem the activities of an FTO as described in the Proclamation a "predatory incursion[,]" even though such actions are not militaristic in the 1798 sense. In other words, for the reasons in the preceding section, the Court finds that "against the territory of the United States" applies to the activities of FTOs. Further, because TdA is perpetrating its activities against and within the United States, the Court finds that the Proclamation satisfies this requirement of the AEA. Fed. Reg. 13034; *see also supra* Section I.

Turning finally to the phrase "foreign nation or government[,]" the Court begins by stressing that it will afford substantial deference to the conclusions of the President on this issue in particular. Indeed, in the realm of "sensitive and weighty interests of national security and foreign affairs[,]" the evaluation of facts by the Executive "is entitled to deference." *Holder*, 561 U.S. 1, 33–34 (2010). That deference is partially due to the fact that neither members of the Supreme Court nor "'most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.'" *Id.* (quoting *Boumediene v. Bush*, 553 U.S. 723, 797 (2008)); *see also Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."). Finally, the Court notes that the

"power to recognize foreign states resides in the President alone[.]" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

Therefore, the Court will accept as true President Trump's conclusion, via the Proclamation, that TdA is acting "at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." 90 Fed. Reg. 13034.

As a result of this conclusion, this Court is in full accord with the United States District Court for the Southern District of Texas, which held as follows on this very issue:

> Although the Proclamation focuses on TdA's activities in the United States, it places control of those activities in Maduro, acting in his claimed role of President of Venezuela. In other words, the Proclamation declares that the country of Venezuela, through Maduro, directs and controls TdA's activities in the United States ... As a result, the Court concludes that the Proclamation places responsibility for TdA's actions in the United States on the Venezuelan government, which satisfies this aspect of the AEA.

*J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450, at *17 (S.D. Tex. May 1, 2025).

In light of the foregoing, the Court finds that President Trump's Proclamation is in step with the AEA. The Court therefore turns its attention to the notice that Respondents are currently providing to those who are subject to the Proclamation, a claim upon which A.S.R. has shown a likelihood of success on the merits.

### 3. The Notice that Respondents Are Currently Providing Is Insufficient

With respect to notice, as the Court explained above, while Respondents represent that A.S.R. is not currently detained pursuant to the AEA, the Court has every reason to believe that he could be designated for removal pursuant to that statute at any time. *See supra* Section II.A. Therefore, for the reasons above, *see id.*, the Court finds that A.S.R. retains standing to challenge the issue of notice. Indeed, the Court is concerned that, if it does not address this issue via this Opinion and Order of Court, Respondents could designate A.S.R. as subject to the Proclamation

and the AEA tomorrow. In that event, there would be nothing prohibiting Respondents from only extending to A.S.R. the notice that the Court finds deficient in light of the Supreme Court's decision in *J.G.G.* Accordingly, the Court shifts its attention to how much notice is due to A.S.R. in light of *J.G.G.* and the Fifth Amendment to the United States Constitution. U.S. CONST. amend. V ("nor shall any *person* ... be deprived of life, liberty, or property, without due process of law") (emphasis added); *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

On this issue, the Supreme Court has held that detainees subject to the AEA are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Therefore, AEA detainees must "receive notice ... that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to *actually seek habeas relief in the proper venue before such removal occurs.*" *Id.* (emphasis added). In light of this language from the Supreme Court, this Court holds that the notice Respondents currently intend to provide, *see supra* Section I.D, is constitutionally deficient, and the Court therefore finds that A.S.R. has shown a likelihood of success on the merits.

Far in excess of the notice that Respondents intend to provide, this Court previously held that fourteen days' notice meets the demands of due process in this context. *See supra* Section I.D. However, when the Court reached that decision, it also certified a class, and the Court was of the mind that fourteen days' notice was sufficient in part because there was counsel representing that entire class. Now, because the Court finds that the legal requirements of a class are no longer satisfied in this case, the Court must consider how much notice is appropriate absent class certification.

When the Court conducts that inquiry, the Court holds that twenty-one (21) days' notice and an "opportunity to be heard", *J.G.G.*, 145 S. Ct. at 1006, is a sufficient period of time to "actually allow [A.S.R.] to seek habeas relief in the proper venue before such removal [under the AEA and the Proclamation] occurs." *Id.* The Court reaches this finding for three reasons. First, the Court is intimately familiar with ICE removal proceedings due to the fact that MVPC is located in the geographical region over which this Court's division sits, leading this Court to consider myriad habeas petitions challenging removal on an annual basis. In light of that familiarity, the Court knows that individuals in ICE custody are frequently moved, counsel for such individuals may have a difficult time speaking with them, and such individuals cannot realistically file for habeas relief within a matter of hours. Second, the Court is concerned that, if it does not provide sufficient notice and opportunity to be heard, individuals who are not in fact subject to the AEA and the Proclamation may be errantly removed from this country. And third, the Court finds that twenty-one (21) days' notice does not unduly burden the Government in this context.

Further, pursuant to *J.G.G.*'s admonishment that the notice Respondents provide must inform detainees that they are "subject to removal under the Act[,]" 145 S. Ct. at 1006, the Court will require the notice to clearly articulate that the individual detainee is subject to removal under the Proclamation and the Act. The Court will also continue to require Respondents to provide the notice "in English and Spanish, the language of those sought to be expelled, and if needed, Spanish-to-English interpreters shall be provided for any necessary hearings." (ECF No. 44 at 8). Finally, with respect to A.S.R. in particular, because he has counsel, Respondents shall provide all of the foregoing notice to his counsel as well. In the future, if an individual whom Respondents designate as subject to removal under the AEA and the Proclamation has counsel, and if Respondents can reasonably obtain the contact information for that counsel from other

immigration proceedings or the like, the Court encourages Respondents to provide such notice to that counsel.

In sum, the Court finds that Respondents must provide to individual detainees who are subject to the AEA and the Proclamation the following notice before removing them pursuant to those provisions of law: (1) twenty-one (21) days' notice and an "opportunity to be heard," (2) notice that clearly articulates the fact that the individual detainee is subject to removal under the Proclamation and the AEA, and (3) notice in English and Spanish, the language of those sought to be expelled, and if needed, Spanish-to-English interpreters shall be provided for any necessary hearings. In the case of A.S.R., if Respondents again designate him as subject to the AEA and the Proclamation, they must provide all of the foregoing notice to his counsel at that time.

The Court recognizes that it may need to conduct further analysis and consider additional issues related to the specifics of notice in the future. However, at this preliminary stage of this case, the Court finds that the foregoing is appropriate and complies with the law. If either party believes that the Court needs to consider these and related issues in greater detail as this case progresses, the Court invites that party to raise any issue(s) it sees fit to this Court at the appropriate time and in the appropriate manner.

### 4. A.S.R.'s Additional Arguments Are Unavailing

Before turning to the other preliminary injunction factors, the Court must consider two of A.S.R.'s additional arguments. For the following reasons, neither leads the Court to conclude that he is likely to succeed on the merits.

First, A.S.R. contends that, under the AEA, the "President may lawfully remove noncitizens … only when those designated noncitizens 'refuse or neglect to depart' voluntarily." (ECF No. 57 at 15). For their part, Respondents argue that "the departure period is only available

37

to those 'not chargeable with actual hostility, or other crime against public safety.'" (ECF No. 59 at 26) (quoting 50 U.S.C. § 22). Therefore, according to Respondents, because President Trump "expressly found that the identified TdA members are engaged in active hostilit[,]" the President need not provide a period of voluntary departure before "effectuating removal." (*Id.*).

On this issue, Respondents are correct. It is a "fundamental rule of statutory construction that all parts of a statute must be read together." *United States v. Gordon*, 961 F.3d 426, 431 (3d Cir. 1992). While one section of the AEA does reference those who "refuse or neglect to depart" from the United States, the next section indicates that an individual shall be permitted time to settle his affairs and depart if he is "not chargeable with actual hostility" and the other statutory requirements are met. 50 U.S.C. §§ 21–22. Together, these provisions provide "that the President acting under the AEA need not offer voluntary departure to alien enemies who[m] the Executive Branch has concluded are engaged in chargeable actual hostility." *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450, at *12 (S.D. Tex. May 1, 2025).

Here, President Trump found that all members of TdA are, "by virtue of their membership in that organization, chargeable with actual hostility against the United States[.]" 90 Fed. Reg. 13034. Therefore, because that finding has factual support, *see supra* Section III.B.1.d, the Court holds that President Trump need not provide members of TdA an opportunity to depart prior to removal. Accordingly, A.S.R. has not shown a likelihood of success on the merits with respect to this issue.

Second, A.S.R. argues that Congress intended the INA to supersede all previous laws regarding deportability, including the AEA. (ECF No. 57 at 27). According to A.S.R., although Congress "knew of the AEA when it enacted the INA, it deliberately declined to exclude AEA-based removals from this statutory scheme—even as it carved out express exceptions elsewhere."

(ECF No. 66 at 13). Conversely, Respondents argue that, even assuming there is a conflict between the AEA and the INA, "it is the AEA that would control" because a specific statute governs a general one. (ECF No. 59 at 28).

Title 8, United States Code, Section 1229a(a)(3) does provide that, unless "otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." However, it is a "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). And when there is "'no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *Id.* (quoting *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974)) ("The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all.") (internal quotation marks and citation omitted). Finally, the law does not favor repeals by implication. *Id.* at 154.

Here, A.S.R. has not pointed to a clear statement by Congress within the INA indicating that that statute repeals the AEA. Further, A.S.R. has not shown this Court that the INA repeals the AEA by implication, something that the law disfavors in any event. Finally, the Court *notes* that counsel for J.G.G. made this exact argument to the Supreme Court, and that Court said nothing about the INA repealing the AEA, explicitly or otherwise in its decision in *J.G.G. J.G.G., et al.,*

*Plaintiffs-Appellees, v. Donald J. TRUMP, in his official capacity as President of the United States, et al.*, Defendants-Appellants., 2025 WL 857790, at *24 (contending that the "INA, enacted after the AEA, is the sole and exclusive procedure for removal") (internal quotation marks and citation omitted); *Trump v. J.G.G.*, 145 S. Ct. 1003 (2025).[15] Therefore, the Court holds that A.S.R. has failed to show a likelihood of success on the merits on this issue.

In light of all of the foregoing, the Court notes that the only issue the Court has considered upon which A.S.R. has shown a likelihood of success on the merits is notice under the AEA. Accordingly, the Court denies A.S.R.'s Motion for a Preliminary Injunction with respect to all issues that the Court has considered thus far, with the lone exception of the issue of notice. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) ("[A] movant for preliminary equitable relief *must* meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits … and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. *If these gateway factors are met*, a court then considers the remaining two factors[.]") (emphasis added). With respect to the issue of notice, the Court now addresses the remaining preliminary injunction factors.

### C.    The Other Preliminary Injunction Factors Favor Granting Relief Regarding the Issue of Notice

As the Court explained above, in addition to likelihood of success on the merits, A.S.R. must show that he is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest." *SEC v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024).

---

[15] This Court recognizes that the Supreme Court did not address this issue in its opinion in *J.G.G. See J.G.G.*, 145 S. Ct. 1003. This Court is simply noting that this argument was raised to the Supreme Court, and rather than agreeing with it, the Supreme Court issued an Opinion providing that challenges to the AEA must be brought in habeas and overviewing the notice due to individuals subject to the AEA, among other things. Those facts offer some implicit support for this Court's finding on this issue.

Regarding irreparable harm, the Supreme Court has explained that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") allows for continued "prosecution of a petition after removal[.]" *Nken v. Holder*, 556 U.S. 418, 435 (2009). Accordingly, the "burden of removal alone cannot constitute the requisite irreparable injury" in that context because "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Id.* Conversely, in the context of the AEA, the law is far from settled, and as the United States District Court for the Southern District of New York recently noted, current events make it unclear whether individuals who are removed from the country but are not actually subject to removal (that is, individuals who are removed in error) will be able to return. *G.F.F. v. Trump*, No. 25-CV-2886, 2025 WL 1301052, at *10 (S.D.N.Y. May 6, 2025). Therefore, in this context, on the record now before this Court, and given the current status of this case, this Court finds that A.S.R. has shown a likelihood of irreparable harm in the absence of preliminary relief. *Id.* at *10–11.[16]

Finally, with respect to the balance of the equities and the public interest, because A.S.R. is currently detained, he is not posing a risk to public safety at this time. *Id.* at *11. And if this Court does not grant A.S.R. injunctive relief, there is a significant risk that he would be deprived

---

[16] A.S.R. also argues that Congress "enacted the Foreign Affairs Reform and Restructuring Act ('FARRA') to codify the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ('CAT') and to ensure that noncitizens have meaningful opportunities to protection from torture." (ECF No. 57 at 25). A.S.R. further contends that these "protections apply regardless of the mechanism for removal." (*Id.*). For their part, Respondents represent that the United States "abides by its CAT obligations," (ECF No. 59 at 13), and explain that the "United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured and to seek assurances where appropriate." (*Id.* at 29). Finally, Respondents note that the Proclamation calls for action that is "consistent with applicable law[.]" (ECF No. 59 at 4) (internal quotation marks and citation omitted).

Because Respondents have assured the Court that they are abiding by their CAT obligations, and the Court possesses no evidence to the contrary, the Court finds that A.S.R. has failed to show a risk of irreparable harm in the absence of preliminary injunctive relief on this ground. The Court therefore denies A.S.R.'s Motion with respect to this issue. In doing so, the Court strongly encourages Respondents to continue to comply with their CAT obligations and all other legal requirements in their interactions with A.S.R.

of the rights due him under Supreme Court precedent. *Id.* Therefore, the Court finds that the two remaining factors support the grant of a preliminary injunction on the issue of notice in this case. *Id.*

In short, this Court grants A.S.R.'s Motion for a Preliminary Injunction on the issue of notice, and the Court denies his Motion in all other respects.

### D.    Security Bond

Before concluding, the Court must consider whether to require a security bond, and if so, the amount of the bond.

Federal Rule of Civil Procedure 65(c) provides that the "court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined[.]" Fed. R. Civ. P. 65(c). Although the "amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (internal quotation marks and citation omitted). The carveout that the Third Circuit has recognized is the "exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant[.]" *Id.*

This may well be a case in which it is appropriate to waive the bond requirement altogether. However, due to the mandatory language of Rule 65(c) and the "exceptionally narrow" carveout recognized by the Third Circuit, the Court will simply exercise its discretion to require A.S.R. to post a nominal bond of $1.00. Given the nature of this case and all of the circumstances before the Court, the Court finds that that amount is appropriate.

## IV.    Conclusion

As the Court stressed at the beginning of this Opinion, this case implicates significant issues. In resolving those issues, this Court's unflagging obligation is to apply the law as written. When the Court does so, it finds that the Proclamation now at issue complies with the AEA, and the Court further finds that Respondents must provide greater notice to those subject to removal under the AEA than they are currently providing. Having done its job, the Court now leaves it to the Political Branches of the government, and ultimately to the people who elect those individuals, to decide whether the laws and those executing them continue to reflect their will.

An appropriate Order follows.


DATED: May 13, 2025

**STEPHANIE L. HAINES**
**U.S. DISTRICT COURT JUDGE**