IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

A.S.R.,

                    Petitioner,
                                        Civil Action
        vs                              No. 25-113

DONALD J. TRUMP, et al.,
                    Respondents.

_____

            Transcript of Oral Argument proceedings held on
Monday, May 5, 2025, United States District Court, Johnstown
Pennsylvania, before the Honorable Stephanie L. Haines, U.S.
District Court Judge.


APPEARANCES:

For the Petitioner:          DANIEL GALINDO, Esq.
                             dgalindo@aclu.org
                             LEE GELERNT, Esq.
                             lgelernt@aclu.org
                             WITOLD J. WALCZAK, Esq.
                             vwalczak@aclupa.org




For the Respondents:         MICHAEL LEO IVORY, Esq.
                             michael.ivory@usdoj.gov
                             MICHAEL VELCHIK, Esq.
                             michael.velchik@usdoj.gov




Court Reporter:    Shirley Hall, RDR, CRR
                   U.S. Courthouse, Suite 204
                   Penn Traffic Building
                   319 Washington Street
                   Johnstown, PA  15901
                   shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2        (In open court.)
 3             THE COURT:  Please be seated.
 4             Good afternoon.
 5             ALL PRESENT:  Good afternoon, Your Honor.
 6             THE COURT:  All right.  This is the time and the place
 7    set for the preliminary injunction hearing in the case of
 8    A.S.R. versus Trump, et al.  This case is docketed at Case
 9    No. 3:25-civil-113.
10             I'm Judge Stephanie Haines, and I'll ask the parties
11    to enter their appearances at this time, and we will start with
12    the petitioner.
13             MR. GELERNT:  Good afternoon, Your Honor.  Lee Gelernt
14    from the ACLU for Petitioners.
15             MR. GALINDO:  Good afternoon; Daniel Galindo from the
16    ACLU for Petitioners.
17             MR. WALCZAK:  Good afternoon, Your Honor.
18    Witold Walczak from the ACLU of Pennsylvania for Petitioners.
19             THE COURT:  All right, thank you.
20             All right.  And on behalf of the Respondents?
21             MR. IVORY:  May it please the Court, Michael Ivory on
22    behalf of the U.S. Attorney's Office.  Good afternoon.
23             MR. VELCHIK:  Michael Velchik also for Government
24    Defendants.
25             THE COURT:  All right.  In accordance with this
```

1    District's electronic devices policy, the following applies to
2    all persons present here in Courtroom A as well as anyone who
3    may be observing from Courtroom B.
4         Members of the public may not possess electronic
5    devices in Courtroom A or Courtroom B and must surrender all
6    such devices to our court security officers, which should have
7    already occurred before any members of the public entered the
8    courtroom here today.
9         The attorneys appearing here today are permitted to
10   possess electronic devices at counsel table.
11        Members of the news media who have produced employer
12   issued photo identification may possess electronic devices in
13   Courtrooms A and B, but such devices are not permitted to be
14   used and must be turned off while in either Courtroom A or B.
15        Now, as previously discussed and agreed to by the
16   parties in this case, the Petitioner will have 45 minutes for
17   their presentation on the preliminary injunction motion, and
18   the Respondents will then be afforded 45 minutes for their
19   response.  And, finally, the Petitioner will be given
20   15 minutes to reply.
21        So, with that, I will turn the presentation over to
22   the Petitioners.
23        MR. GELERNT:  Your Honor, unless you have a
24   preference, Mr. Galindo will address the threshold issues of
25   standing and class certification and he'll go first, and then I

1    will address the merits and remaining issues.

2              THE COURT:  That's fine.

3              MR. GALINDO:  Thank you, Your Honor.

4              I want to start with standing.  And so A.S.R. has been

5    accused of being a member of Tren de Aragua -- I will -- this

6    is what's being called TdA throughout -- has been accused in

7    I-213 as being a member of that group.  The President's

8    Proclamation as to TdA is broad.  It says anyone in A.S.R.'s

9    situation is subject to immediate removal.

10             THE COURT:  Attorney Galindo, can you move the

11   microphone up, just so we hear you loud and clear.

12             MR. GALINDO:  Yes, of course.  Let me know -- how's

13   that?

14             THE COURT:  That's better.  Thank you.

15             MR. GALINDO:  Of course, thank you.

16             So he has been accused of being a member of TdA, as

17   mentioned.

18             I think the case that is relevant to this and cited in

19   our papers and again in reply and not really ever addressed by

20   the Government is *Susan B. Anthony List*, and I think it applies

21   fully to the situation and sets out the test of substantial

22   risk of harm.  And it is, as I said, not grappled with by the

23   Government.

24             I think there was a couple of relevant points there as

25   to *Susan B. Anthony List*.  One is that it's relevant that other

1    people similarly situated have faced the harm that A.S.R.

2    faces.  So, 137 people are in CECOT under the Alien Enemies Act

3    who are not meaningfully differently situated, who have been

4    accused of TdA membership in their I-213s, just as A.S.R. was.

5            The other point -- and I think this may be a subtlety

6    in the papers -- is that the Government has not disavowed that

7    it can change its mind at any point and so designate and then

8    move as quickly as 12 hours or 24 hours to then remove A.S.R.

9            And the disavowal is important as well.  It's also

10   discussed in *Susan B. Anthony List*.  And I think the subtlety

11   here is that the O'Neill declaration put in by the

12   Government -- that's ECF 26-5 -- is both very carefully worded,

13   says -- the affiant said that he's unaware of anyone at

14   Moshannon.  But it's also dated after A.S.R. was moved from

15   Moshannon, as Your Honor knows.  So it is referring to the

16   present time.  It is signed on April 16th, and A.S.R. was

17   already gone at that point.

18           So there's not any kind of disavowal as to -- it does

19   not address A.S.R. specifically at all.  It says, I am --

20   quote:  I am unaware of any Venezuelan citizens detained at

21   Moshannon who are confirmed members of TdA and have been, are,

22   or will be subject to the Proclamation.  So that's hardly a

23   disavowal as to A.S.R.

24           And I think, unsurprisingly, courts around the country

25   have found standing in these cases.  And I think this case,

1    similarly, must have standing for A.S.R. to go forward as to

2    the class.

3         As to class certification, Your Honor has looked at

4    that issue in the TRO, has explained the reasoning as cited,

5    the permissible use of class and class habeas, and the

6    Government has not questioned or responded as to class in their

7    papers.  I think that's fairly waived in the circumstance.

8         Certainly the nature of people having passed through

9    Moshannon on their way to CECOT both establishes that that can

10   happen in the past, that can happen in the future; and that

11   when it does happen, it can happen quite quickly.  And so the

12   key point there would be the transitory nature, the extent to

13   which it can be extremely hard otherwise to address these

14   concerns proactively and provide any kind of relief if it is

15   not a class action.

16        I think this is further buttressed both by our

17   arguments as to notice and also some of the declarations we put

18   in about the practical realities of filing a habeas in the

19   first place at Moshannon, the extent to which many people are

20   unrepresented, the extent to which filings would have to be by

21   mail -- that itself could take days.  All those practical

22   realities that I think are Exhibits 10 and 11 as to our motion

23   also counsel in favor of class certification.

24        THE COURT:  Let me ask you a question:  You referenced

25   my class certification order, which is docketed at No. 45,

1    where I determined who the class representative will be and who

2    class counsel will be.  And I also note in there that the

3    parties may raise the issue of whether the Government must

4    identify members of the class and provide notice when a class

5    member is transferred into the district.

6         And in my order I said I would allow parties the

7    opportunity to address that specific part of my order.  So

8    since we are talking about that order, I'd like to hear from

9    you on that.

10         MR. GALINDO:  Yes.  So I think that naturally

11    dovetails from this conversation, as Your Honor has picked up

12    on.

13         And so the difficulties of finding out that someone

14    has been so designated, that someone might have been designated

15    elsewhere and then only transferred in, and the realities of

16    the difficulty of access to counsel, the number of days that it

17    takes to even schedule a call necessarily -- even in this

18    matter we've had to use the assistance of government counsel to

19    be able to get a call scheduled quick enough to address even

20    the jurisdictional matters, so I think notice to class counsel

21    is both a regular feature of class actions and seems to be a

22    sort of minimal step to provide the information for class

23    counsel to be able to investigate and understand who's even in

24    the class in the first place.

25         So I think it goes directly to the -- the fact that,

1    one, this information is held by the Government.  The

2    Government is uniquely positioned to be able to say one way or

3    the other whether they have designated someone.  Class counsel

4    does not -- individual counsel for anyone who happens to be

5    represented is not as well.  The practice of notices thus far

6    in Alien Enemies Act use is that counsel to the individuals are

7    not in the -- all the cases that we have brought, they are not

8    separately getting notice when the government designates one of

9    their clients.

10        So, I think providing it to class counsel is essential

11   for that particular purpose and it allows us to then follow up

12   as needed.

13        THE COURT:  And would you agree with me, then, if I do

14   order that, that the class counsel needs to be immediately

15   notified of that designation, then that would play into, if we

16   get to this point, the amount of notice?  I know -- and this

17   might be your co-counsel's argument, but I know the amount of

18   notice that you're recommending is 30 days.

19        But wouldn't you agree with me, if I'm ordering the

20   Respondents to immediately notify class counsel, that that

21   30 days might not be as necessary and a shorter period of time

22   would be appropriate?

23        MR. GALINDO:  Your Honor, I think to some extent that

24   would be -- I understand that intuition.  I think to some

25   extent it might play out in terms of is that actually going to

1    be immediate, is that actually going to be feasible, is that

2    kind of assessment and information readily available upon

3    transfer?

4         In practical terms, when counsel for someone in

5    immigration proceedings has their clients transferred, it's

6    quite common that they don't know where their client is for a

7    few days, and they don't show up on the detainee locator, et

8    cetera.  So to the extent any kind of lag along those lines is

9    replicated in terms of how immediate their notification

10   actually plays out, I think, one, that would counsel for a

11   longer period.

12        But I do -- sorry, one moment -- but to be clear, the

13   14 days is immensely important, and I think we will address at

14   a later point in this argument the request for 30 days.

15        THE COURT:  Okay.

16        MR. GALINDO:  If I could just have one moment.

17      (Off the record discussion between co-counsel.)

18        MR. GALINDO:  If, Your Honor, there are no further

19   questions as to standing, I can switch to my co-counsel.

20        THE COURT:  That's fine, yes.  Thank you.

21        MR. GALINDO:  Thank you, Your Honor.

22        MR. GELERNT:  Thank you, Your Honor.

23        Maybe I could just jump in where you were asking my

24   co-counsel about the time between serving class counsel and the

25   amount of time, because I think that's a fair question,

1    Your Honor.

2         What -- we do think that a significant amount of time

3    is necessary in case they designate perhaps hundreds of people

4    at one time.  It would be very difficult to get those habeas

5    petitions in.  But I do -- I do agree with you, that there is a

6    tie between class counsel being served and the amount of notice

7    that's needed.

8         So if Your Honor chooses to keep the 14 days, what we

9    would respectfully ask, if that at 14 days from when they

10   notify us.  Because, otherwise, if there's a lag -- as my

11   co-counsel explained, if there's a lag time between when they

12   designate and when they actually tell us, and they don't

13   actually tell us 'til 7 days before, then we wouldn't have

14   ultimately have the benefit of even the 14 days.  So, at a

15   minimum, we would respectfully ask that it's 14 days from when

16   they notify us.

17        We do think longer is appropriate.  You know, as we

18   said in our briefs, that's what happened during World War II,

19   30 days.  But we understand if the Court doesn't want to go to

20   30 days.  Maybe somewhere in between.  The District Court of

21   Colorado said 21 days.  But I do think what Your Honor is

22   pointing out is critical, that there be no list of class

23   counsel and that the time period run from there.

24        THE COURT:  Thank you.

25        MR. GELERNT:  And, you know, unless Your Honor has

1    questions about how long the notice -- we certainly obviously

2    disagree that 12 hours' notice is the proper amount.

3            When we were here before you the first time, the

4    government had been talking about 24 hours.  As they

5    announced -- I mean they submitted it under seal in the

6    Southern District of Texas.  Judge Rodriguez unsealed it, but

7    they have now moved for 12 hours.  Your Honor has that.  And so

8    unless there's a question about that, we obviously disagree

9    that 12 hours is sufficient.  The 14 days would seem to be a

10   minimum in our view with -- certainly with class counsel being

11   served.

12           And I would just say I want to get to the other parts

13   of the merits, but that is sufficient for the preliminary

14   injunction, even that part, as to rule on the notice of warrant

15   of preliminary injunction.

16           THE COURT:  I just have a quick question.

17           MR. GELERNT:  Yeah.

18           THE COURT:  When you're referencing the 12 hours that

19   the Respondents are putting forward, are you getting that from

20   a declaration that has been made part of the record?  Is that

21   where you're deriving the 12-hour notice rule on behalf of

22   Respondents from?

23           MR. GELERNT:  Right.  So, Your Honor -- so originally

24   what happened -- I apologize for this background -- but

25   originally what happened is that courts around the country,

1    including Your Honor, were considering the notice issue.  And

2    the government had been talking about not ruling out 24 hours.

3            Last week I was down in Brownsville arguing the case

4    before Judge Rodriguez.  They submitted at the last minute a

5    sealed declaration saying we've moved now to 12 hours' notice,

6    and they didn't submit it in any other court.  We submitted it

7    under seal, since it was still under seal.

8            I believe, Your Honor -- and I need to find the ECF --

9    I apologize.  I'll get you the ECF number in a second -- 40-1.

10   And so while it was still under seal, we wanted Your Honor to

11   have what was submitted under seal.  It may have -- I think it

12   was still under seal when we submitted it to you, but

13   Judge Rodriguez quickly unsealed it.  And so now every court,

14   including the Supreme Court, has the move from them in the

15   declaration to 12 hours' notice.  So you should have that at

16   40-1.

17           THE COURT:  I do, notice of Cisneros declaration.

18           MR. GELERNT:  Exactly, Your Honor.

19           THE COURT:  Yes.  I just wanted to make sure we are

20   focusing on the same declaration.

21           MR. GELERNT:  Yes, Your Honor.  I apologize for not

22   having the ECF right at my hand.

23           THE COURT:  No, that's fine.

24           MR. GELERNT:  So that's where we are now.

25           Unless Your Honor has more questions about the notice,

1    I would turn to the threshold question about whether the

2    Proclamation satisfies the statutory prerequisites of the Alien

3    Enemies Act.

4            THE COURT:  That's fine.

5            MR. GELERNT:  All right.  And so I think the place --

6    so as Your Honor knows, the statute is not an open-ended grant

7    the President has.  It has very specific statutory criteria.

8    There has to be a declared war between the United States or a

9    foreign government or nation.  The Government doesn't claim

10   that we're in a declared war with Venezuela or the TdA gang.

11           The other part of the statute is that the

12   Government -- the President can invoke it if there is a, quote,

13   unquote, invasion or predatory incursion by a foreign

14   government or nation and -- against the United States's

15   territory.  We've -- the Government is obviously invoking that

16   part of the statute.

17           We think that, to start with, before you even get to

18   whether there's a foreign government or nation, that there's

19   plainly no invasion or predatory incursion.  The three

20   judges -- only three judges have actually addressed that at

21   this point:  Judge Henderson in the D.C. Circuit in the context

22   of the stay -- that's the J.G.G. decision; most recently

23   Judge Rodriguez in the Southern District of Texas issued a

24   lengthy opinion -- in addition to the research that we put in

25   historically, he did his own historical materials.  You may

1    have seen that.  And Judge Sweeney in the District of Colorado

2    also found that there's no invasion.

3            And I think -- I want to just make two points about

4    that prong.  The first is the government has made a big deal

5    about not contesting the President's findings.  We have put in

6    declarations showing that those findings are untenable.  But,

7    Your Honor -- this is important -- we do not think you need to

8    go there and decide whether you have the authority, even with a

9    lot of deference, to test the President's findings in the

10   Proclamation.

11           What Judge Rodriguez said was:  Just look at the four

12   corners of the Proclamation.  It does not show that there is a

13   military invasion or predatory incursion.  And that's the

14   critical definition of invasion or predatory incursion as

15   understood by the Congress at the time it passed the 1798 Act.

16   And not surprisingly, as Your Honor knows, it's only been used

17   three items in our country's history:  The War of 1812, World

18   War I, and World War II.

19           So what Judge Rodriguez did, what Judge Henderson did,

20   and what Judge Sweeney did is say there is no talk within the

21   four corners of the Proclamation about TdA engaging in a

22   military invasion.  And that's understandable because,

23   obviously, they're not engaged in a military invasion.  And so

24   the proper construction of the statutory terms is that there

25   needs to be a military invasion or an armed force invading a

1    territory of the United States.

2         So we would ask Your Honor to follow the decisions of

3    those three judges in following that there hasn't been an

4    invasion or predatory incursion, and therefore the Alien

5    Enemies Act can't be used in this peacetime context against a

6    criminal organization.

7         THE COURT:  Okay, I'm going to stop you right there.

8         Obviously, you know, there's the three, as you point

9    out:  Declared war, invasion, or predatory incursion.

10   Obviously, as we all I think can agree, there's not a

11   declaration of war, which obviously requires a congressional

12   declaration.  So then we come down to invasion and predatory

13   incursion.

14        I want to focus us in more on the predatory incursion

15   because, in looking at invasion, this Court looks at the plain

16   and, frankly, ordinary or obvious meaning of invasion.  And

17   maybe it's from my 24-and-a-half years in the military, but it

18   appears that the argument could be that an invasion equates to

19   some type of military force entering a nation's territory with

20   the intention or purpose of taking over, obtaining control over

21   that nation's territory or a hostile encroachment.

22        So with that being said, I'm going to ask you this,

23   though:  Now, the Supreme Court has explained that while every

24   statute's meaning is fixed at the time of enactment, new

25   application may arise in light of changes in the world.  So

1    isn't it fair to say that what qualifies as a predatory

2    incursion has changed in light of the facts of the modern

3    world, and therefore the Proclamation does describe a predatory

4    incursion?

5              I want you to address specifically that, how it's not.

6              MR. GELERNT:  Yes.  Yes, Your Honor.

7              Well, I don't think this is a statute that moves with

8    time, but I want to take your premise and not push back on your

9    premise for the moment.

10             What we understand predatory incursion to be is the

11   beginnings of an attempt to engage in invasion or, ultimately,

12   a declared war.  I think that's what the statute has in mind,

13   that it's the first step, its incipient step toward ultimately

14   an invasion.  But it still has to be military in nature.  It

15   doesn't have to be that the forces ultimately are on U.S.

16   territory, as Your Honor pointed out, trying to take over U.S.

17   territory; but it has to be a step toward that.  And I don't

18   think anything in the Proclamation comes anywhere close to

19   that.

20             And so I think that's why Judge Rodriguez was

21   absolutely correct, and he dropped a footnote at the end noting

22   that the Proclamation uses the term irregular warfare.  But

23   what he then goes on to point out is in describing what

24   irregular warfare is, it's just basic criminal activity.

25             And I think two points on that are noteworthy.  One is

1  even the government is not actually talking about any type of

2  military action, whether it's invasion or predatory incursion.

3  If you look at Mr. Smith's declaration from the government, he

4  uses the word crime or criminal activity fifteen times; not

5  once does he allude to military.  And what he ultimately says

6  is this is a law enforcement activity.  So even when they're

7  putting something in under oath, they're not talking about the

8  military as to invasion or a predatory incursion.  So I think

9  that's absolutely critical.

10        Otherwise, what you would have is a situation that,

11  literally, any gang, any group, any ethnic group, any religious

12  group could be tagged as invading if their interests are

13  contrary to the United States; and, ultimately, when pushed, I

14  think that's where the government goes.  Anytime there's

15  something contrary to the United States's interests, you have a

16  predatory incursion or invasion, and that gets into very, very

17  dangerous ground.

18        I don't think there's any religious group, any ethnic

19  group in the history of this country that hasn't been

20  associated with some type of criminal organization.  And at

21  that point, then, literally, anybody could be tagged with the

22  Alien Enemies Act label.

23        THE COURT:  But isn't there a distinctive step that's

24  also happened in this case, where there has been a designation

25  of an FTO, a foreign terrorist organization, attached to TdA,

1   which -- you know, that's regulated under the United States

2   Code as to, you know, that the Congress has the opportunity to

3   revoke that designation.  They could be -- those designations

4   can be challenged.  So doesn't that make it a little different?

5           MR. GELERNT:  Well, I mean -- but still, Your Honor,

6   because there's very little oversight of that, virtually any

7   group could be tagged.  But I think -- but to Your Honor's

8   point, I think that ultimately that's more atmosphere, because

9   the government is not suggesting that that alone is enough to

10  invoke the Alien Enemies Act.

11          And so we do think that predatory incursion has to

12  have some military aspect.  There is -- the Proclamation reads,

13  like on its face -- and Your Honor has seen more of these than

14  I have -- is basically a RICO indictment of a criminal

15  organization.  And so that's why I think every judge that has

16  now weighed in -- and, again, Judge Henderson, Judge Sweeney,

17  and Judge Rodriguez -- have all felt like within the four

18  corners, they're basically talking about what they view as a

19  dangerous criminal organization.

20          And many, many organizations have now been hit with a

21  foreign terrorist label, but it doesn't allow them to invoke

22  this extreme authority that's always been understood as a

23  wartime authority.  Even if Your Honor is right, that there can

24  be some evolution of the application of terms, I don't think

25  the government can get away from the fact that it was about the

1  military.

2       I mean that's why the history shows there was a

3  Friendly Handling Act, and it was this, and all that context

4  that Judge Henderson laid out, that Judge Rodriguez laid out

5  shows it ultimately has to have some tie to the military and

6  wartime, and it can't just be about dangerous gangs.

7       And we are not here to remotely suggest that the

8  government can't label TdA as dangerous, that they can't detain

9  them, that they can't remove them under the immigration laws --

10  and, in fact, the immigration laws has an Alien Terrorist Court

11  that they can use if they really feel like that's necessary.

12       Nor, of course, are we here to say that if they commit

13  crimes in the U.S., they can't be prosecuted.  It is just

14  whether this very, very specific statute that's cabined in a

15  very specific way and was enacted about wartime can be used.

16       And I think if Your Honor goes back -- I mean I know

17  Your Honor has studied the Proclamation enough already; but if

18  you go back, you'll see, as Judge Rodriguez did, that there's

19  really nothing talking about the military and wartime.  There

20  has to be something about that, so I think that's our basic

21  argument there.

22       The foreign government/foreign nation, I think what we

23  would say, I don't -- well, first of all, Your Honor doesn't

24  have to reach that if you find that the invasion or the

25  predatory incursion criteria is not satisfied, and doesn't need

 1    to reach that, of course, if Your Honor wants to do it solely

 2    based on the notice was insufficient.

 3            But on that, we would just simply say that it has to

 4    name a foreign government or nation, here being Venezuela.  It

 5    stopped short of doing that.  The fact that some gang has some

 6    influence on a foreign government really doesn't separate it

 7    out from virtually any country.  I mean every country's private

 8    organizations have some influence on the government, including

 9    ours.  There are gangs that control various blocks in every

10    country.  That can't be sufficient.

11            TdA obviously can't engage in treaties.  They don't

12    have, as the statute says, citizens or denizens.  They have, as

13    the Proclamation points out, members.  But if Your Honor

14    chooses not to reach that, Your Honor doesn't have to.

15            The only other thing I would want to raise -- and I

16    know we are getting close to time -- is the fact that the Alien

17    Enemies Act bypasses the immigration laws.  And we've laid that

18    out in our brief, but one thing I do want to point out in

19    particular is our convention against torture and pain.

20            There's not really any question that the prison in

21    El Salvador is one of the most brutal in the world and engages

22    in torture.  And when the government says we don't send anybody

23    to places where they're going to be tortured, I think that

24    there is zero -- now, obviously the Proclamation doesn't

25    discuss that, doesn't discuss CECOT in El Salvador.  There's

1  really no evidence on the other side that this is not a place
2  where people are tortured.  And the government's argument is
3  only that we would have to raise that claim in a petition for
4  review directly to the Circuit from immigration proceedings.

5          The reason why that's impossible is because, as
6  Your Honor knows, the Alien Enemies Act is being used in a very
7  specific way.  It's getting people out of immigration
8  proceedings and putting them under the Alien Enemies Act.  So
9  it's impossible for anybody to actually raise their torture
10 claim through that process.

11         Now, if Your Honor were to say the Alien Enemies Act
12 can't be used anymore and they were put back in immigration
13 proceedings, then for sure that's how they would have to raise
14 their CAT claim.  They would have to raise it before an
15 immigration judge, before the Board of Immigration Appeals, and
16 then ultimately directly to the Circuit.

17         And I would just ask Your Honor to look at *E.O.H.C.*
18 from the Third Circuit, which we've cited, which says that the
19 reason there are these provisions saying exclusive means to
20 raise various claims is in a courtroom by petition for review
21 is because Congress wanted to streamline, to have only one bite
22 at the apple.

23         But what that court -- that court in the *E.O.H.C.* also
24 said, the Third Circuit, is if you can't do it that way because
25 it's a practical impossibility, then you can do it in

 1    District Court.  Also the *Resolve* decision involved the

 2    diplomatic assurances in CAT, from the Third Circuit, is

 3    also -- is also relevant to that.

 4           So that the bottom line is that if we were left in

 5    immigration proceedings, we'd be happy to raise our CAT claim

 6    through those channels; but because we've been taken out of

 7    immigration proceedings, we can't do that.

 8           So unless the Court has questions, I think we will

 9    stop there and use our rebuttal time.

10           THE COURT:  All right.  Thank you.

11           MR. GELERNT:  Thank you, Your Honor.

12           MR. VELCHIK:  May it please the Court, I agree that

13    the issues in this case have been adequately briefed, and I

14    think the Court is well prepared to issue a ruling based on

15    those submissions.  I would, therefore, just limit my remarks

16    to emphasizing three points.

17           The first is the extraordinary nature of the relief

18    requested.  As this Court is aware, preliminary injunction has

19    been recognized as an extraordinary relief, but I think that

20    there are three factors here that make it particularly

21    exceptional.  The first is that the one named Petitioner is not

22    subject to the Alien Enemies Act.  He is not being designated,

23    detained, or removed pursuant to that authority.

24           THE COURT:  Okay.  I'm going stop you right there --

25    and I don't mean to interrupt you, but I want -- right from the

1  beginning I want to make sure that I understand this.

2         So there is an I-213 -- which is a form, obviously --

3  that identifies A.S.R. as a member of TdA.  Now -- and I read

4  in your briefings that, you know, he doesn't have standing

5  because it's -- he's not.  And then also on Page 5 -- I think

6  it's Page 5 of your response in opposition -- you state:  ICE

7  has not yet determined that A.S.R.'s currently subject to the

8  Proclamation governing removal.

9         So I have to ask, which is it?  The I-213, what you

10  just told me right now, he's not subject to it; or Page 5 of

11  your brief, which sort of says ICE hasn't determined it yet.

12  You can't have it all three ways, so which is it?

13         MR. VELCHIK:  Thank you for giving us the opportunity

14  to clarify.

15         There are separate statutory schemes to detain or

16  remove individuals.  There is Title 8, established by the INA.

17  As part of those proceedings, the government may submit forms

18  providing additional context or reasoning to support removal

19  through the Title 8 proceedings, and that can include a gang

20  affiliation or membership.

21         There is also the separate authority, the Alien

22  Enemies Act, that requires a Presidential Proclamation.  And

23  then the government has to designate an individual for removal

24  under that authority by statute.  And then under the

25  President's Proclamation there are several criteria:  Have to

1    be 14 years of age, Venezuelan national, a member of TdA.

2    However, the government has not at this point -- and I'm not

3    aware of any intent to designate this particular individual for

4    removal under the Alien Enemies Act.

5        And so as the matter stands, he is being detained and

6    proceeding through Title 8 proceedings that has included

7    information about some of his affiliations; but the government

8    has not designated him for removal under the Alien Enemies Act.

9    It is not processing him under that authority.  That is not the

10   basis for his detention or removal.  And so we think that there

11   is a separate process under Title 8 that he is currently going

12   through that provides a process that would be a sufficient

13   independent basis for removal.

14       But in the interim, he has sought relief in this court

15   through habeas to challenge a law that he is not currently

16   being detained under, and we think that that presents a number

17   of issues:  Number one, jurisdiction; number two, standing; and

18   number three, class certification, which I'm happy to elaborate

19   on.

20       THE COURT:  Let me ask you a follow-up question then.

21   Is there any possibility whatsoever, even however slight, that

22   the government will in the future deem A.S.R. removable under

23   the Proclamation?  Is that possible?

24       MR. VELCHIK:  The government has not done it thus far.

25   I am not aware of any intent to do so.  That's as much as I can

1   provide the Court at this time.

2           THE COURT:  But you would agree with me you could.

3   You could change that designation and proceed at some point in

4   the future.  If you develop more information or more things

5   come to light, that you could change the designation and then

6   proceed at a later time under the AEA.

7           MR. VELCHIK:  I wouldn't want to concede that.  I'd

8   also want to just provide clarity on a couple of nuances.

9           So, first of all, as the Court is aware, there are

10  specific criteria such as the age, the nationality.  And so,

11  for example, it is true that this particular individual's above

12  14 years of age and therefore also in that criteria.

13          In terms of the TdA membership, this issue has come up

14  in a number of cases.  It is a fact specific inquiry.

15  Individuals subject to the AEA may challenge this; but I do

16  want to draw this distinction for the Court.  There's a

17  difference between having some association with TdA or having,

18  you know, lived in certain areas nearby the members of TdA, or

19  for having anything else in their backgrounds that might merit

20  a reference to TdA in a Title 8 proceeding.  But that is

21  different from actual membership in the TdA organization.

22          And I know that's been a point of distinction in a

23  number of cases.  And that is a fact specific determination.

24  But I think I would just respond to the earlier statements that

25  I'm not aware at this time of any intent to move forward with

1    this particular individual through Alien Enemies Act

2    proceedings, and we think that the Court lacks jurisdiction for

3    that reason.  But he is currently proceeding under Title 8,

4    which is a completely separate process.

5              THE COURT:  Okay, go ahead.

6              MR. VELCHIK:  In light of that determination, we think

7    that there are three legal bars to granting relief in,

8    particularly, a preliminary injunction, one of which is

9    standing.  And we acknowledge that, you know, likelihood or

10   some sort of imminent harm is part of that analysis, and that

11   has been discussed, and we are happy to elaborate on that.

12             However, a second part is jurisdictional.  I don't

13   think this has been addressed in our colloquies yet, and I

14   think it's analytically distinct from the standing analysis.

15             So in order to have jurisdiction in this case,

16   Petitioner's filed for habeas.  By statute, an individual must

17   be in custody under the law that he is challenging.  He is in

18   custody under Title 8 and could challenge the legality of his

19   detention or removal under Title 8.  But in terms of subject

20   matter, he is not in custody under the Alien Enemies Act.

21             We think that is legally significant, and we think

22   that that deprives this Court of subject matter jurisdiction

23   over this case.  And the fact that the Court lacks jurisdiction

24   plays into the first prong of a preliminary injunction,

25   likelihood of success.  And so, again, we think that's one of

1    the exceptional and unusual facts of this case that would
2    preclude relief.

3            Relatedly, I did also want to address class
4    certification.  At the threshold, I think it's important to the
5    Government that the Supreme Court has never squarely held that
6    habeas corpus proceedings are amenable to class action
7    certification.  But even if we were to go through the Federal
8    Rules of Civil Procedure 23 requirements, there are a number of
9    unusual unprecedented facts about this case.

10           Number one, the sole named Petitioner here is not
11   typical insofar as he is not currently designated under the
12   Alien Enemies Act.  We think that also raises questions under
13   commonality, but most critically, numerosity.  I can provide
14   the Court with an update.

15           To the government's knowledge, there are currently
16   zero individuals in the Western District of Pennsylvania who
17   have been designated under the Alien Enemies Act for detention
18   or removal.  That leads us to this extraordinary fact pattern
19   where an individual not subject to the Act is seeking to obtain
20   federal jurisdiction to enjoin the government from carrying out
21   the Act on behalf of a class that consists of no members.

22           And so for all those reasons, we think that Petitioner
23   is unlikely to succeed on the merits, and there are
24   particularly unusual circumstances that should preclude relief
25   in this case.

1              Second, I would like to address the merits briefly.

2    Much of the debate on the merits has turned on what amount of

3    process is due.  This appears in the brief, but we would just

4    emphasize that due process is fundamentally a fact specific

5    inquiry.  The standing, the Supreme Court decision in *J.G.G.*,

6    simply just uses the word reasonable.  If this Court does reach

7    the merits, an important question will be, well, what is

8    reasonable?  What are relevant sources of law to look to to see

9    what might be reasonable under these circumstances?

10             We think some of the best evidence is found in what

11   Congress has codified elsewhere in Title 8, under Section 235

12   of the INA.  The Government is supposed to, preferably within

13   24 hours and no later than 7 days, remove individuals subject

14   for an expedited removal proceedings.  And if we can use that

15   timeline to remove individuals under Title 8, we think that the

16   unusual emergency relief authorities provided to the government

17   under the Alien Enemies Act shouldn't have to go beyond what is

18   already provided for expedited removals of other individuals

19   under Title 8.  So I think that is sort of a useful baseline to

20   try and reason from determining what reasonable is in these

21   circumstances.

22             THE COURT:  Well -- and you referred to *J.G.G.* and

23   what the Supreme Court said, that notice has to be reasonable.

24   But aren't you sort of forgetting the other part of what the

25   Supreme Court said in *J.G.G.*, not only is notice to be

1    reasonable, but to be given in such a manner as will allow for

2    the detainees under the Alien Enemies Act to actually seek

3    habeas relief before such removal occurs?

4         So I think -- I understand the reasonable notice part,

5    but the Supreme Court is also saying that they have to be given

6    and allowed the opportunity to actually seek habeas relief.

7    How is that supposed to be done under either your 12-hour or

8    your 24-hour theory?

9         MR. VELCHIK:  Yes.  I'm happy to address just going in

10   order.  This Court has provided injunction directing the

11   process due in this district.  That hasn't come up because

12   there are zero individuals who have been designated.  I think

13   in our colloquy we've referenced the Cisneros declaration, just

14   to clarify my understanding.

15        Individuals who are being designated for removal under

16   the Alien Enemies Act will be given at least 12 hours' notice

17   in order to indicate intent to file for habeas relief.  They

18   will then have at least another 24 hours after indicating their

19   intent to actually file for habeas.  And once the individual

20   does file for habeas, the government has no intent to remove

21   any such individual pending their litigation.

22        The government's position is that this is reasonable,

23   that individuals have in fact been able to file for habeas

24   relief.  That is not an issue in this case again because the

25   one named Petitioner here has not been designated under the

1    Alien Enemies Act.  But there is litigation, for example in

2    Texas, where individuals have actually been able to file habeas

3    and their claims have been adjudicated and the government has

4    not removed them.  So we do think that, in practice, it has

5    been an adequate process.

6              Is that responsive?

7              THE COURT:  It is.

8              Well, let me follow up with you.  So with this

9    24 hours you believe not only is reasonable notice, but

10   actually allows these detainees to seek habeas relief before

11   removal occurs, would you agree with me that what's really

12   important, too, is the notice that's given to them, it be in

13   the appropriate language so that they can actually understand

14   what the notice even is?

15             MR. VELCHIK:  We agree.  And as described in the

16   declaration that is now part of the record, information is

17   communicated in writing.  It is also translated into a language

18   that the detained individual will understand.  And there's even

19   a certification requirement that the officer signs indicating

20   that it has been communicated in a language that the individual

21   prefers.  So we think that that meets those process

22   requirements.

23             And I would also appreciate the opportunity to weigh

24   in on your question previously about whether or not a notice

25   requirement for a potentially certified class should take into

1    account that nuance in determining what process is due.

2    I do think it would affect the due process analysis.
3    It is fundamentally fact specific, and I do think that one
4    could imagine different fact patterns where there might be an
5    individual without representation in a very rural area who does
6    not have the access.  He could require more time to physically
7    write his own habeas action and have someone file it on his
8    behalf.

9    If this Court were to certify a class under these
10    circumstances and require the government to provide notice to
11    opposing counsel, I do think that it would be a fact pattern on
12    the opposite end of the spectrum where individuals have the
13    ability to communicate by phone already.  We would be required
14    to notify counsel directly -- and at least in some of these
15    cases I think there are over a dozen counsel representing
16    certain individuals.  And presumably it would not take 30 days
17    to at least make a filing in court.

18    And so if the Court decides to certify a class, which
19    the government opposes, and to impose a notice requirement to
20    opposing counsel, we do think that that would affect what
21    process would be due.

22    THE COURT:  Okay.

23    MR. VELCHIK:  Further, on the merits, I'd also
24    appreciate the opportunity to discuss the question of statutory
25    interpretation under the Alien Enemies Act.

1          As a threshold matter, the government takes the

2     position that whether or not an invasion or predatory incursion

3     has occurred is a fundamental question that implicates some of

4     the President's core executive functions under the

5     Constitution, including his role as the commander-in-chief, as

6     well as his ability to serve as the sole organ in foreign

7     affairs, which is particularly applicable here given that some

8     of the removal arrangements have required negotiations at the

9     highest level of government to ensure that another country will

10    receive these individuals.  The government has submitted a

11    memorandum to that effect.

12         However, if this Court does decide to interpret the

13    Texas statute for itself, the Court could selectively decide

14    that interpreting some terms such as invasion or predatory

15    incursion are not amenable to judicial review.  Maybe other

16    terms are, such as denizen or citizen or whether someone is

17    over 14 years of age.

18         If this Court does determine that it has -- that it is

19    appropriate to interpret the terms invasion or predatory

20    incursion, the Court could also apply an instruction that

21    provide these different grades with deference.  But, if the

22    Court decides to go that route, I did want to just make a

23    couple points about statutory interpretation for those phrases

24    since they've been raised.

25         The first is simply to note that this statute is quite

1    extraordinary in the language that it uses in being maximally

2    encompassing and deferential to the Executive Branch.  Chief

3    Justice Marshall has acknowledged this as does the

4    Supreme Court.  It acknowledges a declaration of war for which

5    there is a constitutionally prescribed process, not at issue

6    here.  It also references an invasion and a predatory

7    incursion.  But they are -- I would emphasize that there's also

8    associated phrases that expand the terms to even a threatened

9    invasion or a threatened predatory incursion.  And so we think

10   that that is especially broad language and the Court should

11   interpret the statute as a whole with that in mind.

12        More specifically, we're trying to understand what an

13   invasion means or what the phrase predatory incursion means.

14   One method that I found useful in interpreting these phrases is

15   trying to understand what the words ultimately or

16   etymologically mean.

17        Invasion comes from the Latin, invado, which means

18   sort of going into.  So it sort of suggests going across, sort

19   of, the sovereign territory and entering the nation.  The

20   President's Proclamation has found that there is an invasion or

21   threatened invasion, and that TdA has in fact crossed our

22   borders in violation of our laws and has occupied lands.

23        And in terms of predatory incursion, predatory goes

24   back to the Latin for booty or plunder.  It has been used in

25   diverse contexts, not just to military activities, but also to

1    raiding Indian tribes or to pirates.  We have the example of

2    the Barbary pirates at the time of the founding.  Courts even

3    have used it with reference to fishing vessels that have come

4    for plunder; and so I think that gloss sort of adds further

5    context as to just how broad and encompassing these terms are.

6    We believe that the President's invocation of the Alien Enemies

7    Act under the Proclamation is enough to invoke those

8    authorities.

9         If the Court wishes to look on the face of the

10   Proclamation, we believe there's enough information there to

11   satisfy the Court in its review that there has in fact been an

12   invasion or predatory incursion or at least a threatened

13   predatory incursion.

14        THE COURT:  And can you -- on that point, I'd like to

15   ask you, can you detail for me -- and I think you heard the

16   question I posed to opposing counsel about sort of the Court

17   looking more at the predatory incursion language rather than

18   the invasion -- but can you point out exactly where in the

19   Proclamation that substantiates the predatory incursion?

20        MR. VELCHIK:  Certainly.  The first paragraph in

21   particular outlines some of the activities of TdA.  As you've

22   noted, it's a foreign terrorist -- a designated foreign

23   terrorist organization, but it describes their conduct of

24   irregular warfare, hostile actions in conjunction with a

25   government, which we think supports a finding of the military

1    nature of their activities.  It describes a number of violent

2    crimes that can occur, both in a criminal context but also in

3    the military or predatory context:  Homicides, murders,

4    kidnappings, extortion, drugs trafficking, weapons trafficking.

5    We think all of those describe specific acts that are predatory

6    in nature.

7         There is also a description of intent of certain TdA

8    actors at the end of the first paragraph, where the President

9    based on the information uniquely available to him describes

10   some of the objectives that TdA has.  Obviously, it reads

11   specific episodes where TdA has controlled certain area, has

12   committed specific times.  But the government, partly through

13   the end of Paragraph 1 and elsewhere, describes its larger

14   objectives.

15        I say this also in reference to the government's own

16   affidavits that are submitted as exhibits to the TRO, filings

17   describing not just the history of TdA, but also its

18   operations, its tactics, how it seeks to explore, control, and

19   consolidate land and assert territorial control to that extent.

20        So even if the Court looks beyond the basic

21   Proclamation, we think that there is enough empirical support

22   in the Government's own affidavits to support the President's

23   conclusions.

24             THE COURT:  Thank you.

25             MR. VELCHIK:  Finally, one point to emphasize this

1      Court is likely aware of, but it's important to the government.

2      If this Court were to grant injunctive relief and craft a

3      continuing relief limiting the government's ability to enforce

4      its authority under the Alien Enemies Act, I think it is

5      critical to distinguish, as all other courts have, between

6      Title 8 and the Alien Enemies Act.  And just to be perfectly

7      clear, in whatever order is issued, that any injunction against

8      the Government executing its authority pursuant to the Alien

9      Enemies Act does not in any way diminish its authority to

10     continue to detain or remove individuals under Title 8.

11             In particular, if the one named individual or any

12     other class members are detained and removed and have issue of

13     -- or for a final removal under Title 8, that the government

14     could remove them pursuant to that law notwithstanding

15     litigation over the Alien Enemies Act.  I just wanted to

16     clarify that for the Court.

17             If there are no further questions --

18             THE COURT:  There are not; thank you.

19             MR. VELCHIK:  Thank you.

20             THE COURT:  All right.

21             I'm going to start with a question for you.  So you

22     heard opposing counsel describe in detail how the Petitioner is

23     in custody under Title 8, not in custody under AEA.  So I'd

24     like you to address that at the outset.

25             MR. GELERNT:  Your Honor, I'm going to turn it over to

1    my colleague, but I would just note that the same was true in

2    all the other districts for the most part.  But I'll -- if it's

3    okay, I can turn it over to my colleague.

4            THE COURT:  Absolutely.

5            MR. GALINDO:  Thank you, Your Honor.

6            I think Your Honor's question speaks to the case

7    *Maleng*, M-A-L-E-N-G, and also the case *Braden*.  Those are both

8    Supreme Court cases.

9            The basic point is the in-custody element is flexible

10   and can be challenged to use future detention.  So even under

11   the government's representations, which as Your Honor noted in

12   questions do not at all foreclose on a dime changing and

13   designating and seeking to remove and invoking the Alien

14   Enemies Act, that kind of future detention habeas is flexible

15   enough to accommodate it and allows them to sue in that basis.

16           And, you know, I think part and parcel with that would

17   be the Supreme Court directing that for this type of challenge,

18   habeas is the appropriate way to bring that kind of case.

19           Your Honor, I'll just very briefly, as to standing,

20   just substantively the government has said in the I-213 that

21   they think A.S.R. is in TdA.  And AEA designation would repeat

22   that same substantive allegation.  I think it's very hard to

23   see how that is not a substantial risk of being harmed or a

24   credible threat of being harmed, which is precisely what

25   suffices for standing.

1        I heard the government suggest that association or
2   associate, as I understand it, could be different in the I-213
3   context than the AEA.  If Your Honor looks at ECF 57-7 at
4   Page 9 -- it's a fairly large exhibit -- that particular
5   individual, where precisely the allegation of associate is what
6   it says about that individual, and that person is now in CECOT.

7        Similarly, the validation guide that we put into
8   evidence as well that is an exhibit to the Sarabia Roman
9   declaration, Exhibit H to our preliminary injunction papers.
10  That validation guide says that if someone were to admit to
11  being an associate, that would be an automatic ten points and
12  equal to being a member by the guide's own scoring mechanism.

13       So I'm just not sure that that distinction has any
14  practical -- I just don't see how that actually plays out in
15  reality as anything other than underscoring the harm that
16  people can face and the extent to which the exact same
17  allegation can be used again to sentence someone to prison.

18       If Your Honor will permit, I'll check in and see if I
19  missed anything.

20      (Off the record discussion between co-counsel.)

21       MR. GALINDO:  Are there any further questions as to
22  that or any remaining matters?

23       THE COURT:  Not on standing, no.

24       MR. GELERNT:  Your Honor, I don't have anything
25  further unless Your Honor has questions about the merits or any

 1   of the other --

 2           THE COURT:  No.  Obviously I was giving you the

 3   opportunity if you wanted to reply to anything that opposing

 4   counsel said on the merits or --

 5           MR. GELERNT:  No, Your Honor.  I think we will rest on

 6   the papers and what we've said.

 7           I just want to make one other request respectfully,

 8   that A.S.R. be brought back here because his counsel is here;

 9   and if he is designated, it will be difficult for his counsel

10   to communicate with him in Texas or get down there to the

11   border in Texas.  So we would respectfully ask that A.S.R. be

12   brought back by the government.

13           THE COURT:  All right.  Thank you.

14           MR. GELERNT:  Thank you, Your Honor.

15           THE COURT:  All right.

16           All right.  Well, I want to thank both parties for

17   their excellent written briefings that are quite plentiful and

18   extremely helpful and very well-written and also for the

19   outstanding arguments that the parties presented here today.

20           This Court will take this matter under advisement and

21   render a decision in due course.

22           With that, court is in recess.

23           MR. KEYS, LAW CLERK:  All rise.  Court is in recess.

24      (Court recessed at four o'clock p.m.)

25

1                    C E R T I F I C A T E

2    I, Shirley Ann Hall, certify that the foregoing is a correct

3    transcript for the record of proceedings in the above-titled

4    matter.

5

6

7                              s/Shirley Ann Hall
                               Shirley Ann Hall, RDR, CRR
8                              Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25